Hamilton County EMS Association,
IAFF Local 4956, appellee,
v. Hamilton County,
Nebraska, appellant.

___ N.W.2d ___

Filed July 31, 2015.    No. S-14-435.

1. **Commission of Industrial Relations: Appeal and Error.** Any order
   or decision of the Commission of Industrial Relations may be modi-
   fied, reversed, or set aside by the appellate court on one or more of
   the following grounds and no other: (1) if the commission acts without
   or in excess of its powers, (2) if the order was procured by fraud or is
   contrary to law, (3) if the facts found by the commission do not support
   the order, and (4) if the order is not supported by a preponderance of the
   competent evidence on the record considered as a whole.
2. **Labor and Labor Relations.** Generally, supervisors are not to be
   included in a bargaining unit with other employees who are not
   supervisors.
3. **Commission of Industrial Relations: Labor and Labor Relations.**
   Three questions must be answered in the affirmative for an employee to
   be deemed a supervisor under Neb. Rev. Stat. § 48-801(14) (Cum. Supp.
   2014): First, does the employee have authority to engage in 1 of the 12
   listed activities? Second, does the exercise of that authority require the
   use of independent judgment? Third, does the employee hold the author-
   ity in the interest of the employer?
4. **Labor and Labor Relations.** The purpose of the exclusion of supervi-
   sors from bargaining units is to ensure that employees who exercise
   discretionary authority on behalf of the employer will not divide their
   loyalty between the employer and the union.
5. **Commission of Industrial Relations: Labor and Labor Relations.**
   In order to ensure union protection to employees whom Neb. Rev. Stat.
   § 48-801(14) (Cum. Supp. 2014) is designed to protect, supervisory

status must not be interpreted too broadly as to deny employee rights to those whom the statute is intended to protect.

6. **Labor and Labor Relations: Proof.** Where an employer is attempting to show that employees were supervisors, the employer has the burden of proving their supervisory status in labor proceedings.

7. **Commission of Industrial Relations: Labor and Labor Relations.** While an employee may be authorized to direct coworkers, for the direction to be supervisory under Neb. Rev. Stat. § 48-801(14) (Cum. Supp. 2014), the employee must also be responsible, meaning answerable for the discharge of a duty or obligation.

8. ____: ____. To responsibly direct under Neb. Rev. Stat. § 48-801(14) (Cum. Supp. 2014), the employee must be held fully accountable and responsible for the performance and work product of the employees he directs.

9. ____: ____. In order for Neb. Rev. Stat. § 48-801(14) (Cum. Supp. 2014) to apply to an employee, 1 of the 12 enumerated duties that are associated with being a supervisor must also be exercised with independent judgment.

10. **Commission of Industrial Relations: Labor and Labor Relations: Words and Phrases.** The statutory term "independent judgment" is ambiguous with respect to the degree of discretion required for supervisory status.

11. **Labor and Labor Relations.** Many technically supervisory functions may be performed without the exercise of such a degree of judgment or discretion as would warrant a finding of supervisory status.

12. ____. The degree of judgment that might ordinarily be required to conduct a particular task may be reduced below the statutory threshold by detailed orders and regulations issued by the employer.

13. **Labor and Labor Relations: Proof.** Secondary indicia only aid in establishing supervisory status where there is evidence that one of the statutory or primary indicia is first satisfied.

Appeal from the Commission of Industrial Relations. Affirmed.

Erin L. Ebeler, of Woods & Aitken, L.L.P., and, on brief, Rachel K. Boyle for appellant.

John E. Corrigan, of Dowd, Howard & Corrigan, L.L.C., for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, STEPHAN, McCORMACK, MILLER-LERMAN, and CASSEL, JJ.

McCormack, J.

## NATURE OF CASE

Hamilton County, Nebraska, appeals the finding of Nebraska's Commission of Industrial Relations (CIR) that two captains of an ambulance service were nonsupervisors and thus could be included in a bargaining unit with other employees. The issue is whether the shift captains of Hamilton County EMS Association, IAFF Local 4956 (Union), should be considered supervisors under Neb. Rev. Stat. § 48-801(14) (Cum. Supp. 2014). The CIR found that the shift captains were not supervisors and that therefore, they could be included in the bargaining unit. Hamilton County appeals. We affirm the finding of the CIR that the shift captains are not statutory supervisors under Nebraska's Industrial Relations Act.[1]

## BACKGROUND

### Union

In August 2013, the Union filed a petition with the CIR seeking to become the exclusive bargaining agent for employees of the Hamilton County Ambulance Service (Ambulance Service). The bargaining unit was to include all full-time emergency medical technicians (EMTs), paramedics, and shift captains. Eighty-eight percent of the claimed appropriate bargaining unit members had authorized the Union to represent them and requested the CIR to conduct a certification election.

The two captains, Brent Dethlefs and Jay Mack, were included in the bargaining unit. The director and assistant director were excluded from the bargaining unit. Hamilton County objected to the captains' inclusion in the bargaining unit.

The CIR held a hearing on December 10, 2013. The CIR found that the captains were not statutory supervisors because "[t]he evidence show[ed] that both the job responsibilities of

---

[1] Neb. Rev. Stat. §§ 48-801 through 48-842 (Reissue 2010 & Cum. Supp. 2014).

the Captain-Training Officer and Captain-Special Operations are more in line with the Paramedics and EMTs than the Director or Assistant Director." The CIR found persuasive the facts that "[c]aptains work the same work schedules, are paid hourly, and receive the same fringe benefits as full-time Paramedics and EMTs"; captains, paramedics, and EMTs are eligible for overtime pay; the duties of the captains are shared by other paramedics and EMTs; and any sole duties of the captains can be taken over by other employees.

### Organization of Ambulance Service

It is the responsibility of the Ambulance Service to respond to emergency calls and provide transfers for patients between medical facilities. The Ambulance Service is staffed with a director, an assistant director, two shift captains, and several full-time and part-time EMTs and paramedics. Three full-time employees are staffed on each shift. Each shift has a shift captain who doubles as either training officer, special operations, or assistant director. All of the shift captains double as paramedics. Currently, the shift captains are Mack, temporary captain/paramedic; Tim Graham, special operations captain/paramedic; and Dethlefs, training captain/paramedic.

### Shift Captains' Duties

Each shift has a daily checklist that the shift workers are responsible for completing before the end of the day. The shift captain is responsible for ensuring that the checklist is completed before the end of the shift. As one captain testified, "The captain doesn't tell you to do the checklist. The captain is there to make sure it gets done, but that's his — kind of one of his duties." The shift workers are also responsible for keeping up the "day book." Typically, the shift captain or senior medic maintains and makes entries into the day book and is responsible for all entries in the book, but other employees may write in the day book if asked to do so.

The primary function of shift captains, like regular employees, is to respond to 911 emergency dispatch calls. At an

emergency scene, captains are supposed to maintain control or command. Control of the emergency scene would, regardless, be with the paramedics, because they have the most training.

The shift captains also participate in interviews of new applicants for positions within the Ambulance Service. However, the captains do not determine who is hired. Instead, the captains are there to provide input on the decision. The director makes the ultimate hiring decision. The captains also do not have authority to determine who is promoted. Rather, promotions are done on a certification basis.

The shift captains do not have the authority to effectuate a layoff or to fire employees. The director is the officer who fires employees. Captains, however, send problems with employees on their shifts to the director. Mack and Dethlefs concurred that they felt they would have the authority to send someone home from a shift, if, for example, that worker came to work intoxicated. The captains do performance evaluations on their workers. The captains can also do writeups on both good and bad behavior. But both Mack and Dethlefs stated that they leave disciplinary matters to the director. Mack stated that he felt he would have a voice or right to express an opinion about whether someone's employment was terminated.

Captains can suggest shift changes, but cannot unilaterally make shift changes. In the role as captain, captains do have the authority to move someone from "backup" to "first call." Captains also have authority to make "special rules" for their shift. For example, Dethlefs has instituted a rule that workers are not to play games on their shift.

Under the Ambulance Service regulations, the chain of command is seven tiered. The regulations state that the force will consist of the director, the assistant director, three captains, full-time employees, and part-time employees. The rank of command is first, the county commissioners; second, the director; third, the assistant director; and fourth, the shift captains. The job description of a shift captain states that

"[t]his position encompasses supervisory and management work . . . ."

All captains are paid hourly, like the other full-time and part-time workers for the Ambulance Service. There are no differences between the benefits offered to supervisors and regular employees.

## TESTIMONY

The director of the Ambulance Service, Catherine Sigler, testified that she would consider each shift captain a supervisor. Sigler believes other workers consider their shift captain their supervisor as well because they look to them for direction for the shift or on a scene. According to Sigler, "If the Director or Assistant Director is unavailable, then the captain is to do whatever needs to be done during their shift." She said this might include calls that need to be made or decisions that need to be made—including how many ambulances to send to a particular scene. Sigler also testified that captains exercise independent judgment by running their shift and dealing with problems that arise, by giving guidance in hiring, and by giving their workers rules on their shifts. However, Sigler did admit that the captains' primary function is to be on shift and respond to calls as they come in. She also admitted that captains cannot hire and fire employees as they wish.

Mack is a temporary shift captain, taking over the duties of another shift captain, Graham, when he went away on deployment in Texas. Mack states that he does not feel his duties have changed since he became a temporary shift captain from a paramedic for the Ambulance Service. Other shift workers testified that the captains do the checklist activities alongside the other workers and that the captains essentially perform the same duties as the rest of the shift workers.

## ASSIGNMENTS OF ERROR

Hamilton County assigns as error the CIR's finding that the shift captains could be included with the nonsupervisors' bargaining unit. Specifically, Hamilton County assigns as error

the findings that (1) the two captains were not statutory supervisors and (2) the captains' responsibilities were more akin to EMTs and paramedics, than to the director and assistant director, and thus shared a community of interest with the employees the captains supervise.

## STANDARD OF REVIEW

[1] Any order or decision of the CIR may be modified, reversed, or set aside by the appellate court on one or more of the following grounds and no other: (1) if the CIR acts without or in excess of its powers, (2) if the order was procured by fraud or is contrary to law, (3) if the facts found by the CIR do not support the order, and (4) if the order is not supported by a preponderance of the competent evidence on the record considered as a whole.[2]

## ANALYSIS

The issue before us is whether or not shift captains should be considered supervisors under the Industrial Relations Act. If the shift captains are supervisors, then they cannot be included in a bargaining unit with other lower level employees. However, if the shift captains are not statutory supervisors, then they may be included in the bargaining unit with the other employees. The CIR correctly classified the shift captains as nonsupervisors.

### Shift Captains as Statutory Supervisors

[2,3] Generally, supervisors are not to be included in a bargaining unit with other employees who are not supervisors.[3] "Supervisor" is defined by the Industrial Relations Act as follows:

---

[2] § 48-825(4).

[3] § 48-816(3)(a); *IBEW Local Union No. 1597 v. Sack*, 280 Neb. 858, 793 N.W.2d 147 (2010); *PLPSO v. Papillion/LaVista School Dist.*, 252 Neb. 308, 562 N.W.2d 335 (1997). See *IBEW Local 1536 v. Lincoln Elec. Sys.*, 215 Neb. 840, 341 N.W.2d 340 (1983).

[A]ny public employee having authority, in the inter-
est of the public employer, to hire, transfer, suspend,
lay off, recall, promote, discharge, assign, reward, or
discipline other public employees, or responsibility to
direct them, to adjust their grievances, or effectively
to recommend such action, if in connection with such
action the exercise of such authority is not of a merely
routine or clerical nature but requires the use of inde-
pendent judgment.[4]

Three questions must be answered in the affirmative for
an employee to be deemed a supervisor under this statute:
"First, does the employee have authority to engage in 1 of
the 12 listed activities? Second, does the exercise of that
authority require 'the use of independent judgment'? Third,
does the employee hold the authority 'in the interest of
the employer'?"[5]

[4,5] The purpose of the exclusion of supervisors from
bargaining units is to ensure that employees who exercise dis-
cretionary authority on behalf of the employer will not divide
their loyalty between the employer and the union.[6] However, in
order to ensure union protection to employees whom the statute
is designed to protect, supervisory status must not be inter-
preted too broadly as to deny employee rights to those whom
the statute is intended to protect.[7]

---

[4] § 48-801(14).

[5] *NLRB v. Health Care & Retirement Corp. of America*, 511 U.S. 571, 574,
114 S. Ct. 1778, 128 L. Ed. 2d 586 (1994). See *IBEW Local Union No.
1597 v. Sack, supra* note 3. See, also, *N.L.R.B. v. Dole Fresh Vegetables,
Inc.*, 334 F.3d 478 (6th Cir. 2003); *Cooper/T. Smith, Inc. v. N.L.R.B.*, 177
F.3d 1259 (11th Cir. 1999).

[6] *NLRB v. Yeshiva University*, 444 U.S. 672, 100 S. Ct. 856, 63 L. Ed. 2d
115 (1980).

[7] *N.L.R.B. v. GranCare, Inc.*, 170 F.3d 662 (7th Cir. 1999). See *Holly
Farms Corp. v. NLRB*, 517 U.S. 392, 116 S. Ct. 1396, 134 L. Ed. 2d 593
(1996).

The National Labor Relations Act[8] has a nearly identical definition of "supervisor." The National Labor Relations Act defines a "supervisor" as follows:

> [A]ny individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.[9]

Since Nebraska's statute so closely resembles that of the federal statute, we find federal case law interpreting this statute instructive. We will use federal case law in examining each of the elements instructive in determining when employees are statutory supervisors.

[6] In general, the burden of proving an exemption rests on the party claiming it.[10] Particularly, where an employer is attempting to show that employees were supervisors, the employer has the burden of proving their supervisory status in labor proceedings.[11]

### Authority to Hire or Promote

If the employee has an ability to hire or promote other employees, then they can be considered supervisors under the Industrial Relations Act.[12] In *Cooper/T. Smith, Inc. v. N.L.R.B.*,[13] the "docking pilots" made recommendations as

---

[8] See 29 U.S.C. §§ 151 through 187 (2012).

[9] 29 U.S.C. § 152(11).

[10] See, e.g., *Meacham v. Knolls Atomic Power Laboratory*, 554 U.S. 84, 128 S. Ct. 2395, 171 L. Ed. 2d 283 (2008); *Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S. Ct. 2223, 41 L. Ed. 2d 1 (1974).

[11] See *NLRB v. Kentucky River Community Care, Inc.*, 532 U.S. 706, 121 S. Ct. 1861, 149 L. Ed. 2d 939 (2001).

[12] See § 48-801(14).

[13] *Cooper/T. Smith, Inc. v. N.L.R.B., supra* note 5, 177 F.3d at 1264.

to hiring and firing, and their recommendations were almost always followed (the vice president "never made a personnel decision against the recommendations of the docking pilots"). The 11th Circuit Court of Appeals found that the authority to make recommendations alone does not indicate supervisory status.[14] Further, the Ninth Circuit Court of Appeals stated that it is merely "the practice of a prudent employer to seek the advice of his foreman in evaluating employees."[15]

Similarly to *Cooper/T. Smith, Inc.*, the Hamilton County shift captains sit in on interviews and give their opinions as to who should be hired in the department when a position opens. The shift captains also complete performance evaluations on other employees in their shift. However, the evidence is uncontroverted that the shift captains do not have the ultimate authority to hire, fire, or promote any employee in the department. As the Ninth Circuit stated, it is merely good practice to seek the opinions of someone present at the scene of the work before hiring or firing, and to evaluate employees. Thus, the shift captains do not have the authority to hire or promote under the statute.

Authority to Transfer, Suspend,
Lay Off, Recall, Discharge,
or Discipline

If an employee has the authority to transfer, suspend, lay off, recall, discharge, or discipline other employees, then he or she may qualify as a statutory supervisor.[16] Because the shift captains do not ultimately have that authority, we disagree with Hamilton County.

In *Frenchtown Acquisition Co., Inc. v. N.L.R.B.*,[17] the charge nurses were able to complete "in-services," which led to the

[14] *Cooper/T. Smith, Inc. v. N.L.R.B., supra* note 5.

[15] *George C. Foss Co. v. N.L.R.B.*, 752 F.2d 1407, 1411 (9th Cir. 1985).

[16] See § 48-801(14).

[17] *Frenchtown Acquisition Co., Inc. v. N.L.R.B.*, 683 F.3d 298, 307 (6th Cir. 2012).

discipline of other employees. However, these in-services were only the first step in a disciplinary process and only brought errors or misconduct to the manager's attention; then, the manager decided how to proceed. The court held that such limited involvement in the disciplinary process did not satisfy the employer's burden of proving that these charge nurses had statutory responsibilities under the statute.[18]

Hamilton County argues that because the shift captains complete performance evaluations on employees, they are effectively able to discipline the employees. Hamilton County also argues that because captains execute oral warnings and written warnings for positive and negative conduct, they effectively discipline the other employees. However, these types of duties are very similar to the in-services reports of the charge nurses which merely were the first step in a disciplinary process.

Hamilton County also points to the fact that shift captains stated that if they saw another shift worker appear at work intoxicated, they felt they would be able to send that worker home. However, one shift captain also testified that he would first attempt to call the director about the situation, and if unable to reach the director, he would most likely ask the intoxicated worker to leave. Hopefully other workers, particularly in the position of EMTs whose functions are to drive an ambulance and respond to medical emergencies, would also feel that their safety and professional integrity would be endangered by having an intoxicated worker on the shift and would also ask the intoxicated worker to leave if they could not contact a superior.

The shift captains cannot actually dispense disciplinary actions or recommend a level of discipline. Shift captains only report what has occurred on their shift. Disciplinary actions, such as suspensions, lay offs, recalls, transfers, discharges, or other types of discipline have to be approved

---

[18] *Id.*

by the director. Thus, shift captains do not have the statutory authority to transfer, suspend, lay off, recall, discharge, or discipline.

### Authority to Responsibly Direct

[7,8] If an employee has the responsibility to direct workers, then the employee may be considered supervisory under the statute.[19] While an employee may be authorized to direct coworkers, for the direction to be supervisory under the statute, the employee must also be responsible, meaning "'answerable for the discharge of a duty or obligation.'"[20] To responsibly direct, the employee must be "held fully accountable and responsible for the performance and work product of the employees he directs."[21] Further, even though an employee holds a highly responsible position, this does not alone mean that an employee is a supervisor.[22] As the U.S. Supreme Court has stated:

> [E]mployees whose decisionmaking is limited to the routine discharge of professional duties in projects to which they have been assigned cannot be excluded from coverage even if union membership arguably may involve some divided loyalty. Only if an employee's activities fall outside the scope of the duties routinely performed by similarly situated professionals will he be found aligned with management. We think these decisions accurately capture the intent of Congress . . . .[23]

For example, in *Cooper/T. Smith, Inc.*, even though the employees were highly trained and directed others in complex and potentially dangerous work, the court found that "[t]he

---

[19] See § 48-801(14).

[20] *NLRB v. KDFW-TV, Inc., Div. of Times Mirror Corp.*, 790 F.2d 1273, 1278 (5th Cir. 1986).

[21] *Id.* (quoting *Marine Yankee Atomic, Etc. v. N. L. R. B.*, 624 F.2d 347 (1980)).

[22] See, e.g., *Exxon Pipeline Co. v. N. L. R. B.*, 596 F.2d 704 (5th Cir. 1979).

[23] *NLRB v. Yeshiva University, supra* note 6, 444 U.S. at 690.

expertise is not . . . exercised with a management prerogative, but rather as an experienced employee."[24] Similarly, in *Neighborhood Legal Services*,[25] attorneys were not found to be supervisors, even though they trained, assigned, or directed work of legal assistants and paralegals. Instead, the training, assigning, or directing was an incident of their professional responsibilities as attorneys.

The position of a charge nurse, with some supervisory duties, but mainly professionally mandated duties, has been analyzed by many courts aiming to determine whether such a job should be classified as supervisory.[26] One court stated that "'nurses are professionals and their exercise of supervision is guided by professional training and norms.'"[27] There is no issue of divided loyalties when "'supervision is required to conform to professional standards rather than to the company's profit-maximizing objectives.'"[28]

Neither does a duty to train other workers mean that an employee has a duty to responsibly direct or that he or she is a supervisor. Even where employees are required to train their coworkers, this alone is not an indication of supervisory status, but, rather, reflects the experience and professional training that those more senior employees already possess.[29] For example, in *Cooper/T. Smith, Inc.*, the "docking pilots"

---

[24] *Cooper/T. Smith, Inc. v. N.L.R.B., supra* note 5, 177 F.3d at 1267.

[25] *Neighborhood Legal Services*, 236 N.L.R.B. 1269 (1978).

[26] See, *NLRB v. Kentucky River Community Care, Inc., supra* note 11; *NLRB v. Health Care & Retirement Corp. of America, supra* note 5; *Frenchtown Acquisition Co., Inc. v. N.L.R.B., supra* note 17; *N.L.R.B. v. GranCare, Inc., supra* note 7; *Providence Alaska Medical Center v. N.L.R.B.*, 121 F.3d 548 (9th Cir. 1997).

[27] *N.L.R.B. v. GranCare, Inc., supra* note 7, 170 F.3d at 666 (quoting *Children's Habilitation Center, Inc. v. N.L.R.B.*, 887 F.2d 130 (7th Cir. 1989)).

[28] *Id.* at 666-67.

[29] See, *Cooper/T. Smith, Inc. v. N.L.R.B., supra* note 5; *N.L.R.B. v. ADCO Elec. Inc.*, 6 F.3d 1110 (5th Cir. 1993).

were required to train employees. However, docking pilots, by nature of their job, were required to have more training and experience. The court held that this was not an "indication of supervisory status, but rather reflects the nature of the docking pilot job itself."[30]

Though there is no written rule stating that the shift captains must be the most senior or most experienced on the shift, it seems that in the Hamilton County department, the shift captains are the most senior and experienced of the shift workers. Just because these shift captains have more experience than other employees does not make them supervisory. The fact that the shift captains also happen to be more senior paramedics, and thus often have more training than other shift workers, is not indicative of their supervisory status.

Similarly to the charge nurses in the federal cases and the docking pilots in *Cooper/T. Smith, Inc.*, the shift captains are required to give some level of direction to their coworkers. As a part of the shift captains' profession, it is their job to respond to 911 calls and to ensure that medical emergencies have a proper response. It is not merely because of their status as shift captains, but also because of their professional responsibility as a licensed paramedic to ensure that these responsibilities are carried out. Further, there is testimony that any shift captain's function at an emergency scene would be to take control or command of the scene—this function is not unique to shift captains. Rather, the paramedic on the scene should have control, regardless of the fact that the paramedic is also a shift captain.

During a typical day, the shift captain makes entries in the day book and makes sure work gets done that is on the daily checklist. However, one captain testified that "[t]he captain doesn't tell you to do the checklist." All of the workers participate in completing the duties before the day's end. Also, workers testified that though the shift captain typically makes the day book entries, anyone else on the shift can do so as

---

[30] *Cooper/T. Smith, Inc. v. N.L.R.B., supra* note 5, 177 F.3d at 1264.

well. The three shift workers (including the shift captain) seem to be in the trenches together and working as a team during their shifts.

The shift captains do sometimes manage staffing on their shifts. For example, Dethlefs once needed to fill a space when shift workers went to a class. Dethlefs testified that he called the director first to check, but ended up calling people to fill in the shifts. Dethlefs also testified that he could ask the director to transfer a worker, but that would not necessarily happen—he could not unilaterally control whether or not someone was transferred. There is some testimony providing that shift captains have the ability to switch shift workers from backup to first call where they need to. However, the director first designates this schedule, and the shift captain then can redesignate as needed.

Because the shift captains' responsibilities are already circumscribed to the shift captains by Hamilton County and the director of the department, and because any other responsibilities are those that are professional responsibilities in the first place, we find that the shift captains do not responsibly direct their coworkers as defined by the statute.

## Authority to Adjust Grievances

If an employee has an authority to adjust grievances, then the employee may be classified as a supervisor under the statute. In this case, a shift captain testified that he did not have the ability or authority to adjust or resolve grievances and that if someone brought to him a dispute about his or her employment, he would direct that person to the director. And Hamilton County does not argue that the shift captains have the authority to adjust grievances.

## Exercise of Independent Judgment

Though we have found that none of the 12 enumerated duties are present in the shift captains' job, as a matter of thoroughness, we also find that the shift captains do not exercise the degree of independent judgment required of supervisors under statute.

[9-12] In order for § 48-801(14) to apply to an employee, 1 of the 12 enumerated duties that are associated with being a supervisor must also be exercised with independent judgment. The statutory term "independent judgment" is ambiguous with respect to the degree of discretion required for supervisory status.[31] Many technically supervisory functions may be performed without the "'exercis[e of] such a degree of . . . judgment or discretion . . . as would warrant a finding'" of supervisory status.[32] "[T]he degree of judgment that might ordinarily be required to conduct a particular task may be reduced below the statutory threshold by detailed orders and regulations issued by the employer."[33] As a matter of policy, the U.S. Supreme Court has reiterated, if any person who uses independent judgment to assign tasks to others or direct their work is a supervisor, then few professionals employed by organizations subject to the labor laws would receive its protections.[34]

The duties of a Hamilton County shift captain, while requiring independent judgment as would be required in any job, do not fall outside of the normal duties of any other worker at the department. The shift captains are given a list of duties that need to be completed each day, and the shift captains make sure the duties are completed. Even though the shift captain can ask that other shift workers ensure that the duties are completed, the shift captain can only use this independent judgment as circumscribed by his employer, to ensure that all shift duties are completed by the end of each workday. Further, each shift captain is a paramedic, who also has professional responsibilities that sometimes include assignment of duties

---

[31] *NLRB v. Kentucky River Community Care, Inc., supra* note 11.

[32] *Id.*, 532 U.S. at 713 (quoting *Weyerhaeuser Timber Company*, 85 N.L.R.B. 1170 (1949)).

[33] *NLRB v. Kentucky River Community Care, Inc., supra* note 11, 532 U.S. at 713-14.

[34] *NLRB v. Kentucky River Community Care, Inc., supra* note 11.

and direction of other workers. As a matter of policy, not all professionals who use independent judgment in carrying out their professional responsibilities are supervisors.

The independent judgment exercised by Hamilton County shift captains, though present as in any professional job, falls below the statutory threshold to make the shift captains supervisors under the statute.

### In Interest of Employer

Finding that the first two requirements of being a supervisor under the Industrial Relations Act are not met, we need not examine the third requirement that the duties be carried out "in the interest of the employer."

### Remaining Arguments

[13] Hamilton County also makes several arguments based on considerations that are not encompassed by the statute. These considerations are otherwise known as secondary indicia. Circuits have held that secondary indicia should be relied upon only in limited circumstances.[35] Secondary indicia only aid in establishing supervisory status where there is evidence that one of the statutory or primary indicia is first satisfied.[36] Because we do not find that one of the statutory indicia is satisfied, we do not address other remaining indicators of supervisory status.

We do not address Hamilton County's assignment of error that the CIR erroneously applied the community of interest exception to the department, because regardless of this exception's application, we find that the shift captains are not supervisors and can be considered in a bargaining unit with the other shift workers.

---

[35] See, e.g., *Jochims v. National Labor Relations Bd.*, 480 F.3d 1161 (C.A.D.C. 2007); *N.L.R.B. v. Dole Fresh Vegetables, Inc., supra* note 5.

[36] See, e.g., *Public Service Co. of Colorado v. N.L.R.B.*, 405 F.3d 1071 (10th Cir. 2005); *Billows Electric Supply*, 311 N.L.R.B. 878 (1993); *Juniper Industries*, 311 N.L.R.B. 109 (1993).

Where the record demonstrates that the decision of the trial court is ultimately correct, although such correctness is based on a ground or reason different from that assigned by the trial court, an appellate court will affirm.[37] Further, Hamilton County had the burden of proving that the shift captains were supervisors, and it did not meet that burden. Therefore, we uphold the CIR's findings that the shift captains are not statutory supervisors under § 48-801(14) and that shift captains should be included in the bargaining unit.

## CONCLUSION

We find that the CIR did not err in classifying the two shift captains as nonsupervisors and allowing them to take part in the workers' bargaining unit.

Affirmed.

---

[37] *Tyson Fresh Meats v. State*, 270 Neb. 535, 704 N.W.2d 788 (2005); *Semler v. Sears, Roebuck & Co.*, 268 Neb. 857, 689 N.W.2d 327 (2004).