Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/05/2016 09:11 AM CDT

- 386 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
DRAKE-WILLIAMS STEEL v. CONTINENTAL CAS. CO.
Cite as 294 Neb. 386

Drake-Williams Steel, Inc., appellant
and cross-appellee, v. Continental
Casualty Company, appellee
and cross-appellant.

Employers Mutual Casualty Company and EMCASCO
Insurance Company, appellees and cross-appellants,
v. Drake-Williams Steel, Inc., appellant
and cross-appellee.

___ N.W.2d ___

Filed August 5, 2016.    Nos. S-15-445, S-15-446.

1. **Insurance: Contracts: Appeal and Error.** The interpretation of an insurance policy presents a question of law that an appellate court decides independently of the trial court.
2. **Summary Judgment: Appeal and Error.** An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.
3. **Insurance: Contracts: Appeal and Error.** The meaning of an insurance policy is a question of law, in connection with which an appellate court has an obligation to reach its own conclusions independently of the determination made by the lower court.
4. **Insurance: Contracts.** In construing insurance policy provisions, a court must determine from the clear language of the policy whether the insurer in fact insured against the risk involved.
5. **Insurance: Contracts: Proof.** In a coverage dispute between an insured and the insurer, the burden of proving prima facie coverage under a policy is upon the insured.
6. ____: ____: ____. If the insured meets the burden of establishing coverage of the claim, the burden shifts to the insurer to prove the applicability of an exclusion under the policy as an affirmative defense.

- 387 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
DRAKE-WILLIAMS STEEL v. CONTINENTAL CAS. CO.
Cite as 294 Neb. 386

7. **Insurance: Contracts: Damages.** Standard commercial general liability policies provide coverage for accidents caused by faulty workmanship only if there is bodily injury or property damage to something other than the insured's work product.

8. **Insurance: Contracts.** The cost to repair and replace faulty workmanship is a business risk that is not covered under a commercial general liability policy.

9. **Insurance.** Business risks are normal, frequent, and predictable and do not involve the kind of fortuitous events for which insurance is obtained.

10. **Insurance: Contracts: Liability.** Where a product manufacturer is liable as a matter of contract to make good on or replace products that are defective or otherwise unsuitable because they are lacking in some capacity, the economic loss incurred because of the product or work is not what was bargained for as part of general liability coverage.

11. ____: ____: ____. There is a fundamental distinction between the non-covered business risk of having to correct faulty products or work and the covered risk of liability when faulty products or work cause damage to other property that cannot be corrected through the correction of the faulty products or work.

Appeals from the District Court for Douglas County: Joseph S. Troia, Judge. Affirmed.

Steven D. Davidson, of Baird Holm, L.L.P., and Thomas A. Vickers and Scott A. Ruksakiati, of Vanek, Vickers & Masini, P.C., for appellant.

Karen K. Bailey, of Engles, Ketcham, Olson & Keith, P.C., and John F. Maher, of Colliau, Carluccio, Keener, Morrow, Peterson & Parsons, for appellee Continental Casualty Company.

Marvin O. Kieckhafer, of Smith Peterson Law Firm, L.L.P., and Brian O'Gallagher, of Cremer, Spina, Shaughnessy, Jansen & Siegert, L.L.C., for appellees Employers Mutual Casualty Company and EMCASCO Insurance Company.

Heavican, C.J., Wright, Connolly, Cassel, and Kelch, JJ.

- 388 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
DRAKE-WILLIAMS STEEL v. CONTINENTAL CAS. CO.
Cite as 294 Neb. 386

Wright, J.

## I. NATURE OF CASE

This case concerns the meaning of coverage provisions in a general liability and umbrella policy insuring the fabricator of steel rebar under a purchase agreement with a general contractor. The rebar was improperly fabricated and had a reduced reinforcing capacity as a result. The defective rebar was incorporated into the construction of concrete pile caps that would form support for the Pinnacle Bank Arena (Arena). Several of the pile caps had to be modified in order to conform to the required specifications of the contract. The insurers refused to reimburse Drake-Williams Steel, Inc. (DWS), for costs incurred to modify these compromised pile caps. The insurers claimed the costs of the remedial measures did not fall under the coverage of the policies. The district court entered summary judgment in favor of the insurers. DWS appeals, and the insurers cross-appeal.

## II. BACKGROUND

### 1. Rebar

M.A. Mortenson Company (Mortenson) is a general contractor hired by the city of Lincoln to build the Arena. Mortenson entered into a purchase agreement with DWS to supply rebar for the Arena. The rebar was improperly bent when it was fabricated by DWS and therefore did not conform to the terms of the purchase agreement. The rebar was incorporated into three components of the Arena: the columns, the grade beams, and the pile caps. The pile caps provide support for the Arena's columns, which in turn support the floor and the roof. The pile caps were made of concrete with reinforcing rebar and were installed below ground level on top of the concrete piles that extended to the bedrock. The grade beams were also made of concrete and rebar. The beams formed an oval around the Arena and connect different pile caps together and were also installed below ground level. DWS did not seek to recover any expenses for any corrections that were made to

the columns that contained the improperly bent rebar. No corrections were made to the grade beams.

The rebar was bent by DWS at too tight a radius and did not meet the specifications. This incorrect radius was determined to be the result of machine and operator error during the process of fabrication. Because of the incorrect radius, the rebar had approximately 50 percent of its normal reinforcing capacity. The nonconforming rebar that had not been cast in the concrete pile caps was removed and replaced by DWS. And DWS made no claim on this replacement. There were 52 pile caps that had been cast with improperly bent rebar. Approximately half of these pile caps with the nonconforming rebar would nevertheless perform adequately given the particular pile caps' shape or placement. But the other half were deemed incapable of providing the required structural support, because of the diminished reinforcing capacity of the nonconforming rebar. If these pile caps were not modified, they would not provide the support required. This could have resulted in a structural failure in part of the Arena. Engineers eventually determined that the most cost-effective solution was to install a reinforcing band around each of the compromised pile caps. This modification would provide the necessary structural support.

To modify these pile caps, new concrete was adhered to the sides of pile caps to make the existing pile caps wider. The new concrete was joined to the existing pile caps by new rebar that was drilled and epoxied into the existing pile caps. This process, once completed, made the pile caps wider and suitable for their intended purpose. The pile caps were essentially wrapped in a ring of concrete and rebar that would then perform as originally designed. The process required excavating around the pile caps, assembling a new form around the pile caps, placing rebar into that form, and pouring concrete into the form.

DWS initially refused to pay for the costs of the correction. Mortenson paid the costs and sought reimbursement from

- 390 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
DRAKE-WILLIAMS STEEL v. CONTINENTAL CAS. CO.
Cite as 294 Neb. 386

DWS in the amount of $1,355,860. Eventually DWS reimbursed Mortenson. DWS sought coverage from its insurers. The insurers denied DWS' claim and commenced this action to determine their obligations under the policies of insurance.

## 2. Policies

For the period of November 1, 2010, to November 1, 2011, DWS was insured through a primary commercial general liability (CGL) policy with Employers Mutual Casualty Company (Employers). From November 1, 2011, to November 1, 2012, DWS was insured through a primary CGL policy with EMCASCO Insurance Company (EMCASCO). DWS was also insured during the relevant time period through an umbrella policy with Continental Casualty Company (Continental). DWS sought coverage under its CGL policies and the umbrella policy. We refer to the insurance companies collectively as "the Insurers."

The relevant coverage provisions of the umbrella policy with Continental are substantially similar to the provisions of the policies with Employers and EMCASCO.

### (a) Damages and Property Damage

The policies agreed to cover "those sums that [DWS] becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies."

"Property damage" is defined by the EMCASCO policy as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

### (b) Occurrence

The insurance applied to "'property damage' only if" the property damage "is caused by an 'occurrence.'"

- 391 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
DRAKE-WILLIAMS STEEL v. CONTINENTAL CAS. CO.
Cite as 294 Neb. 386

"Occurrence" is defined by the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

### 3. Denial of Claim and Suit

The Insurers refused reimbursement under the coverage provisions and exclusions in their respective policies. Employers and EMCASCO eventually brought suit against DWS for declaratory judgment. DWS counterclaimed with actions for declaratory judgment and breach of contract. DWS also filed a separate complaint against Continental for declaratory judgment and breach of contract. The cases were consolidated.

The district court entered summary judgment in favor of the Insurers and overruled DWS' motion for partial summary judgment. The district court reasoned:

> Having now fully reviewed the exhibits, pleadings, arguments of counsel and the law, the Court finds that the pile caps with the nonconforming rebar (DWS's product) were damaged as a result of the nonconforming rebar in that the pile caps were deficient and unable to sustain the load that they were designed for had the proper rebar been used. The majority of courts have found that faulty workmanship would not constitute an accident and, therefore, be an occurrence per policy. The Court finds that for the impaired property exclusion to apply, it would have been necessary for the rebar to be repaired, replaced, adjusted, or removed. By installing the collar/band around the pile caps the impaired pile caps were restored to their intended use and there was no occurrence. The Court, therefore, finds that the "impaired property" exclusion applies.

DWS appeals. The Insurers cross-appeal.

### III. ASSIGNMENTS OF ERROR

DWS assigns that the district court erred in (1) overruling DWS' motions for summary judgment, (2) sustaining the

- 392 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
DRAKE-WILLIAMS STEEL v. CONTINENTAL CAS. CO.
Cite as 294 Neb. 386

Insurers' motions for summary judgment, (3) determining that there was no occurrence as defined in the policies, and (4) finding that the "impaired property" exclusion applied to preclude coverage.

The Insurers cross-appeal to the extent that the district court found that damages at issue consisted of "property damage" under the policies.

## IV. STANDARD OF REVIEW

[1] The interpretation of an insurance policy presents a question of law that we decide independently of the trial court.[1]

[2] An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law.[2]

## V. ANALYSIS

[3,4] The facts are not disputed; the correctness of the district court's order in favor of the Insurers depends on the interpretation of the CGL policies. The meaning of an insurance policy is a question of law, in connection with which an appellate court has an obligation to reach its own conclusions independently of the determination made by the lower court.[3] In construing insurance policy provisions, a court must determine from the clear language of the policy whether the insurer in fact insured against the risk involved.[4]

[5,6] In a coverage dispute between an insured and the insurer, the burden of proving prima facie coverage under a

---

[1] *Federated Serv. Ins. Co. v. Alliance Constr.*, 282 Neb. 638, 805 N.W.2d 468 (2011).

[2] *Phillips v. Liberty Mut. Ins. Co.*, 293 Neb. 123, 876 N.W.2d 361 (2016).

[3] *Auto-Owners Ins. Co. v. Home Pride Cos.*, 268 Neb. 528, 684 N.W.2d 571 (2004).

[4] *Id.*

policy is upon the insured.[5] If the insured meets the burden of establishing coverage of the claim, the burden shifts to the insurer to prove the applicability of an exclusion under the policy as an affirmative defense.[6] The district court concluded that there was not an occurrence and also concluded, in the alternative, that the impaired property exclusion applied. We find as a matter of law that there was no "property damage." Therefore, for different reasons from those stated by the district court, we conclude there was no coverage.[7] Because there was no coverage under the policies, we do not determine the applicability of any exclusions.

In a similar case, the court in *F & H Const. v. ITT Hartford Ins. Co.*[8] held that there was no property damage under the CGL policy. The insured was to supply pile caps fabricated with a certain grade of steel. The insured mistakenly supplied caps with an inferior grade of steel. Those caps were welded onto steel piles before the defect was discovered. As a result, the structural units were inadequate for their intended purpose. In order to avoid the prohibitive cost of removing and replacing the piles, or cutting off the pile caps, the insured modified the pile caps by adding stiffener ribs and welding them onto the piles. Doing so resulted in the necessary structural support for the building. The project was thereby completed on time, and there was no claim for liquidated damages.

The question presented was whether welding defective pile caps to the piles was property damage within the meaning of the policy, because the welded units were inadequate to meet

---

[5] See, *Farm Bureau Ins. Co. v. Martinsen*, 265 Neb 770, 659 N.W.2d 823 (2003); 44A Am. Jur. 2d *Insurance* § 1974 (2013).

[6] 44A Am. Jur. 2d, *supra* note 5.

[7] See *Hamilton Cty. EMS Assn. v. Hamilton Cty.*, 291 Neb. 495, 866 N.W.2d 523 (2015).

[8] *F & H Const. v. ITT Hartford Ins. Co.*, 118 Cal. App. 4th 364, 12 Cal. Rptr. 3d 896 (2004).

- 394 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
DRAKE-WILLIAMS STEEL v. CONTINENTAL CAS. CO.
Cite as 294 Neb. 386

contractual design specifications. The parties did not dispute that an occurrence took place within the "coverage territory" and during the "policy period."

The court held that the costs of remediation were not "property damage" under the policy.[9] The court stated the prevailing view was that incorporation of a defective component or product into a larger structure does not constitute property damage unless and until the defective component causes physical injury to tangible property in at least some other part of the system.[10] Property damage is not established by the mere failure of a defective product to perform as intended.[11]

The court explained that while the defective caps may have rendered the piles inadequate for their intended purpose, the insured was able to provide modifications to create an adequate structural unit such that the caps ultimately served their intended purpose.[12] It found that there was no physical injury and that there was no "loss of use," as that term is commonly understood; i.e., the rental value of similar property that the plaintiff can hire for use while deprived of the use of his or her own property.[13] The court noted the costs of modifying the pile caps was unrelated to rental value.[14]

[7-9] The court's conclusion in *F & H Const.* comports with the general principle that standard CGL policies provide coverage for accidents caused by faulty workmanship only if there is bodily injury or property damage to something other than the insured's work product.[15] The cost to repair and replace faulty workmanship is a business risk that is not covered

---

[9] *Id.*

[10] *Id.* See, also, *Wisconsin Pharmacal v. Nebraska Cultures*, 367 Wis. 2d 221, 876 N.W.2d 72 (2016).

[11] *Id.*

[12] *F & H Const. v. ITT Hartford Ins. Co., supra* note 8.

[13] See *id.*

[14] *Id.*

[15] See *id.*

- 395 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
DRAKE-WILLIAMS STEEL v. CONTINENTAL CAS. CO.
Cite as 294 Neb. 386

under a CGL policy.[16] Business risks are "normal, frequent, and predictable" and do not involve the kind of fortuitous events for which insurance is obtained.[17] As one commentator has explained:

> Replacement and repair costs are to some degree within the control of the insured. They can be minimized by careful purchasing, inspection of material, quality control and hiring policies. If replacement and repair costs were covered, the incentive to exercise care or to make repairs at the least possible cost would be lessened since the insurance company would be footing the bill for all scrap.[18]

[10] Where a product manufacturer is liable as a matter of contract to make good on or replace products that are defective or otherwise unsuitable because they are lacking in some capacity, the economic loss incurred because of the product or work is not what was bargained for as part of general liability coverage. It is a business risk within the insured's control and generally excluded from coverage.[19]

[11] There is a fundamental distinction between the noncovered business risk of having to correct faulty products or work and the covered risk of liability when faulty products or work cause damage to other property that cannot be corrected through the correction of the faulty products or work.[20] A CGL

---

[16] See *id*. See, also, e.g., *LaMarche v. Shelby Mut. Ins. Co.*, 390 So. 2d 325 (Fla. 1980).

[17] Scott C. Turner, *Insurance Coverage of Construction Disputes* § 27:1 (2002). See, also, *American Family Mut. v. American Girl, Inc.*, 268 Wis. 2d 16, 673 N.W.2d 65 (2004).

[18] Stewart Macaulay, *Justice Traynor and the Law of Contracts*, 13 Stan. L. Rev. 812, 825-26 (1961).

[19] See Michael J. Brady, *The Impaired Property Exclusion: Finding a Path Through the Morass. Exclusion M of the ISO CGL Policy Is a Complex and Intricate Provision, With Little and Disparate Case Law to Guide the Way*, 63 Def. Couns. J. 380 (1996).

[20] See *Zurich American Ins. Co. v. Nokia, Inc.*, 268 S.W.3d 487 (Tex. 2008).

- 396 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
DRAKE-WILLIAMS STEEL v. CONTINENTAL CAS. CO.
Cite as 294 Neb. 386

policy is intended to cover an insured's tort liability for physical injury or property damages, not economic losses due to business risks.[21] As another commentator has noted:

> The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work. This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.[22]

Again, "Property damage" is defined by the policies at issue as:

> a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>
> b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

Concrete and the rebar were part of the integrated system of the pile caps. There was no "physical injury" to the rebar

---

[21] *Federated Serv. Ins. Co. v. Alliance Constr., supra* note 1.

[22] Roger C. Henderson, *Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know*, 50 Neb. L. Rev. 415, 441 (1971).

- 397 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
DRAKE-WILLIAMS STEEL v. CONTINENTAL CAS. CO.
Cite as 294 Neb. 386

or the pile caps in which the rebar was cemented. The improperly bent rebar still performed a structural reinforcement but was not as strong as it would have been if bent correctly. Because the defective rebar was discovered before the arena was further constructed, there was no damage to other parts of the system.[23] And because the pile caps could be modified to meet the contractual requirements, rather than destroying and rebuilding the pile caps, there was no physical damage to the pile caps themselves. The pile caps could be modified without any physical damage to any other part of the Arena.

Furthermore, there was no claim by DWS for damages due to the temporary loss of use of the Arena during the period of remediation. Therefore, there was no "loss of use,"[24] as that phrase is understood in the context of "property damage."

The reinforcement of the pile caps was simply part of DWS' contractual obligation to make good on its work. In the purchase agreement, DWS warranted and guaranteed to furnish the rebar free from defects and in compliance with the contract documents. The agreement provided that without costs to the contractor or owner, DWS shall promptly remove or replace defective material and any other work affected by such correction. This liability is not what CGL policies are designed to protect against.[25] The costs of reinforcing the inadequately reinforced pile caps was a business risk and not the kind of fortuitous event for which a CGL policy is obtained.[26]

We do not say that any and all damage arising out of completed work performed by an insured and its subcontractors

---

[23] See *Regional Steel v. Liberty Surplus Ins.*, 226 Cal. App. 4th 1377, 173 Cal. Rptr. 3d 91 (2014).

[24] See James Duffy O'Connor, *Construction Defects: "Property Damage" and the Commercial General Liability Policy*, 24-SPG Construction Law 11 (2004).

[25] See Henderson, *supra* note 22.

[26] See Turner, *supra* note 17.

- 398 -

Nebraska Supreme Court Advance Sheets
294 Nebraska Reports
DRAKE-WILLIAMS STEEL v. CONTINENTAL CAS. CO.
Cite as 294 Neb. 386

is never "property damage" covered under a CGL policy. Depending upon the facts and the method used to correct the defect, there may or may not be coverage under the policy. For example, one method of correcting the existing problem in this case would have been to demolish and replace the pile caps. This would have resulted in damage to other property—the pile caps. But this option was rejected because of the significant cost of $5 to $6 million and its impact on the project schedule.

Other options were actually considered and rejected on the basis of viability, costs, or actual effectiveness of the proposed fix to the problem. Eventually, the solution agreed to by the parties was the installation of a concrete collar around the pile caps. This solution was the most cost effective and most likely to accomplish the goal of the modification. It was understood that the rebar itself was not repaired or replaced, but that instead, the pile caps were modified by way of a retrofit in order to provide the required structural support. We hold that this solution did not involve "property damage."

DWS argues that *Auto-Owners Ins. Co. v. Home Pride Cos.*[27] supports coverage under the policies. We disagree. In *Auto-Owners Ins. Co.*, the owner of an apartment complex contracted with the builder to install new shingles on a number of the buildings. The work was subcontracted. The owner noticed problems with the roof and brought suit against the subcontractor alleging faulty workmanship that had caused substantial damage to the roof structure and the buildings. The insurer filed a declaratory judgment, and the court entered summary judgment, concluding the insured was not covered under the general liability policy. On appeal, we reversed, concluding that the insurer had a duty to defend and that, to the extent the insured may be found liable for the resulting damage to the roof structures and the buildings, the insurer was obligated to provide coverage.

---

[27] *Auto-Owners Ins. Co. v. Home Pride Cos.*, *supra* note 3.

- 399 -

NEBRASKA SUPREME COURT ADVANCE SHEETS
294 NEBRASKA REPORTS
DRAKE-WILLIAMS STEEL v. CONTINENTAL CAS. CO.
Cite as 294 Neb. 386

In *Auto-Owners Ins. Co.*, we reasoned that damages to the roof structures and buildings represented an unintended and unexpected consequence of the contractor's faulty workmanship and went beyond damages to the contractor's own work product; therefore, the petition properly alleged an occurrence and stated a cause for physical injury to tangible property and, therefore, "property damage" under the policy. Once coverage was established, we then examined the policy's exclusions; and because the damages could not be repaired or restored by simply reshingling, they were not excluded by the policy.

The facts in the case at bar are distinguishable. Here, the insured's defective work product did not damage other property. And the inadequacies of the product could be remedied through modification of the integrated pile caps, so as to conform to the required specifications.

Unlike in *Auto-Owners Ins. Co.*, the amount that DWS seeks to recover is the costs incurred to make the pile caps conform to the work that DWS contracted to provide. To construe the CGL policies' definition of property damage to include the modification to the pile caps, which were inadequate due solely to DWS' failure to fulfill its duties under its contract with the general contractor, would convert the CGL policies into performance bonds insuring DWS' business risks. That is not the intent of the CGL policies in question.

## VI. CONCLUSION

We affirm the order of summary judgment in favor of the Insurers, but on different grounds from those stated by the court below. Insofar as the court found there was "property damage," we find merit to the Insurers' cross-appeals. Because the costs for which DWS sought reimbursement were not derived from any physical damage to the pile caps or their temporary loss of use, there was no property damage, and thus no coverage, under the CGL policies.

AFFIRMED.

MILLER-LERMAN and STACY, JJ., not participating.