**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Motorists Mut. Ins. Co. v. Ironics, Inc.*, **Slip Opinion No. 2022-Ohio-841.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-841

MOTORISTS MUTUAL INSURANCE COMPANY, APPELLANT, *v.* IRONICS, INC., ET AL., APPELLEES.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Motorists Mut. Ins. Co. v. Ironics, Inc.*, Slip Opinion No. 2022-Ohio-841.]**

*Insurance—Commercial umbrella insurance policy—Third party incorporated insured's contaminated product into its glass containers, which then had to be scrapped—Claims against insured by the third party are covered under insured's commercial umbrella insurance policy because they arose out of an accident that resulted in "property damage" under the policy and no policy exclusions apply.*

(No. 2020-0306—Submitted March 4, 2021— Decided March 23, 2022.)

APPEAL from the Court of Appeals for Wood County,

No. WD-19-018, 2020-Ohio-137.

_____

**BRUNNER, J.**

**{¶ 1}** This appeal calls for us to consider whether an umbrella insurance policy between plaintiff-appellant, Motorists Mutual Insurance Company ("Motorists"), and defendant-appellee Ironics, Inc., applies to claims made against Ironics by defendant-appellee Owens-Brockway Glass Container, Inc. ("Owens"). The trial court held that the umbrella policy does not apply and therefore granted summary judgment in favor of Motorists, but the Sixth District Court of Appeals reversed. We affirm the Sixth District.

I. Background ............................................................................................¶ 2

II. Analysis ..............................................................................................¶ 8

    A. Standard of review ........................................................................¶ 8

    B. Burden of proof .............................................................................¶ 9

    C. Do Owens's claims fall within the coverage provisions? ........¶ 10

        1. Was there "property damage"? ..........................................¶ 11

            a.  Owens's claims against Ironics are for "property damage"........¶ 14

            b.  Decisions in analogous cases support ...............................................

                the finding that Owens's claims involve "property damage" .....¶ 23

            c.  We decline to adopt the integrated-system rule to determine............

                whether a claim involves "property damage" ..............................¶ 25

                i.  Adopting the integrated-system rule ...........................................

                    would undermine reliance on contracts ...............................¶ 26

                ii.  *Wisconsin Pharmacal* is not persuasive................................¶ 33

iii. Cases cited by Motorists do not require a contrary holding ..¶ 37

2. Was there an "accident"? ...................................................................¶ 42

    a.   The principle of fortuity and *Custom Agri* ...................................¶ 43

    b.   The parties' arguments .................................................................¶ 49

    c.   Owens's claims arose out of an "occurrence" ...........................¶ 53

D. Do any of the policy exclusions apply? ....................................................¶ 63

III. Conclusion .................................................................................................¶ 68

# I. BACKGROUND

**{¶ 2}** Ironics is in the business of buying and selling metal products, including waste generated by steel mills and similar facilities. This case involves a material originally generated as waste by a steel mill in Youngstown that makes tubular products. Ironics obtained the waste product—"tube scale"—in raw form and, after having it processed, resold it to a number of customers.

**{¶ 3}** Owens manufactures glass containers. In October and November 2016, it purchased tube scale from Ironics to use as a coloring agent to make its containers amber or brown. After using Ironics's tube scale to make glass containers, however, Owens discovered that chrome stones were embedded in the containers. The presence of these stones increased the likelihood that the glass containers would break. The stones could not be removed from the glass, nor could the containers otherwise be restored to use. Owens therefore had to scrap more than 1,850 tons of glass containers.

**{¶ 4}** Upon investigation, Ironics discovered that the tube scale had been contaminated when its materials processor, American Waste Management,

subcontracted the tube-scale screening to another company, Foundry Sand Services ("Foundry"). According to Ironics, raw tube scale fell onto the ground while it was being screened by Foundry. American Waste Management instructed Foundry to put the fallen tube scale back into the screening process, but the fallen tube scale had been contaminated with chrome stones, a material that Foundry also processed.

{¶ 5} In January 2017, Owens asserted claims against Ironics for breach of contract, breach of warranties contained in the purchase orders for the tube scale, violations of the Uniform Commercial Code, negligence, and product liability. Ironics asked Motorists, as its insurer, to defend and indemnify it against Owens's claims. Ironics had a commercial general-liability policy ("CGL policy") and a commercial umbrella policy ("umbrella policy") with Motorists. Motorists sought a declaratory judgment that it had no obligation to defend and indemnify Ironics against Owens's claims under either policy. The trial court held that neither policy covered Owens's claims, and it granted summary judgment in favor of Motorists.

{¶ 6} The Sixth District Court of Appeals affirmed in part and reversed in part the trial court's summary-judgment decision. The appellate court held that Ironics was not entitled to coverage under the CGL policy but was entitled to coverage under the umbrella policy. With respect to the umbrella policy, the Sixth District held that Owens's claims against Ironics were covered because the parties had stipulated that Ironics was not aware that the tube scale was contaminated at the time it was used by Owens to make its glass containers and the contaminated tube scale caused physical injury to the containers manufactured by Owens. The Sixth District also held that none of the umbrella policy's coverage exclusions applied. Thus, the court held that Ironics was entitled to coverage for the damage claimed by Owens.

{¶ 7} Motorists appealed the judgment of the Sixth District to this court, asserting a single proposition of law for our review: "The incorporation of a defective ingredient into an integrated product or system does not constitute

4

damage to 'other' property for purposes of liability coverage under commercial general liability and umbrella policies." *See* 158 Ohio St.3d 1504, 2020-Ohio-2819, 144 N.E.3d 444.

## II. ANALYSIS

### A. Standard of review

{¶ 8} "Our review of cases involving a grant of summary judgment is de novo." *Marusa v. Erie Ins. Co.*, 136 Ohio St.3d 118, 2013-Ohio-1957, 991 N.E.2d 232, ¶ 7. This case also involves contract interpretation. Our role is therefore "to give effect to the intent of the parties to the agreement." *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11, citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Companies.*, 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (1999). We review an insurance contract as a whole, *Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St.3d 306, 2007-Ohio-4917, 875 N.E.2d 31, ¶ 7, and we presume that its language reflects the parties' intent, *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 509 N.E.2d 411 (1987), paragraph one of the syllabus. We apply the plain meaning of the policy's language "unless another meaning is clearly apparent from the contents of the policy." *Galatis* at ¶ 11, citing *Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 374 N.E.2d 146 (1978), paragraph two of the syllabus. When contractual language is clear, we look no further than the writing itself to determine the parties' intent. *Alexander* at 246.

### B. Burden of proof

{¶ 9} Motorists argues that Owens's claim is not covered under the umbrella policy.[1] The burden of showing coverage under a contract of insurance is

---

1. Motorists also raises arguments challenging the court of appeals's interpretation of the CGL policy. Because the court of appeals ultimately held that Owens's claim is not covered under the CGL policy, however, Motorists lacks standing to challenge that portion of the court of appeals's judgment. *See Ohio Contract Carriers Assn. v. Pub. Util. Comm.*, 140 Ohio St. 160, 42 N.E.2d 758 (1942), syllabus; *State ex rel. Richardson v. Suster*, 130 Ohio St.3d 82, 2011-Ohio-4728, 955 N.E.2d 982, ¶ 1, fn. 1. We therefore express no opinion as to the correctness of the appellate court's decision concerning the CGL policy.

on the insured. *Sharonville v. Am. Emps. Ins. Co.*, 109 Ohio St.3d 186, 2006-Ohio-2180, 846 N.E.2d 833, ¶ 19. In this case, Motorists argues that even if basic coverage is proved, exclusions in the insurance contract relieve it of any obligation to defend or indemnify Ironics against Owens's claims. The burden of proving that an exclusion applies is on the insurer. *Neal-Pettit v. Lahman*, 125 Ohio St.3d 327, 2010-Ohio-1829, 928 N.E.2d 421, ¶ 19.

### C. Do Owens's claims fall within the coverage provisions?

{¶ 10} The umbrella policy at issue is a type of catchall policy providing that Motorists will pay Ironics for the "ultimate net loss" attributable to any "occurrence" that is either excluded or not covered by its CGL policy. An "occurrence" is defined in the policy as an "accident" that results in property damage. Motorists argues that Owens's claims are not subject to basic coverage, because Ironics's providing contaminated tube scale to Owens did not cause "property damage" and was not an "accident."

*1. Was there "property damage"?*

{¶ 11} We consider first whether there was "property damage." The insurance contract defines "property damage" as "[p]hysical injury to or destruction of tangible property * * *, including all resulting loss of use of that property." According to Motorists, the "tangible property" cannot be the insured's own product but must instead be some *other* property. As Motorists interprets the policy language, Ironics's tube scale did not cause "property damage," because it did not cause damage to *other property*, that is, Ironics's tube scale caused damage only after it was incorporated into Owens's containers and at that point, Motorists argues, those containers were not "other property." Motorists's key argument on this point is that the integrated-system rule should be applied in this case. According to Motorists, that rule provides that the "incorporation of a defective ingredient into an integrated product or system does not constitute damage to

6

'other' property for purposes of liability coverage under commercial general liability and umbrella policies."

{¶ 12} In support of its argument, Motorists points to *Wisconsin Pharmacal Co., L.L.C. v. Nebraska Cultures of California, Inc.*, 367 Wis.2d 221, 2016 WI 14, 876 N.W.2d 72, in which the Supreme Court of Wisconsin applied the integrated-system rule to facts analogous to those here. The insureds in *Wisconsin Pharmacal* agreed to supply a particular type of bacteria to be used in the production of probiotic-supplement tablets. When they provided the wrong type of bacteria, which led to the tablets' being mislabeled, recalled, and then destroyed, the insureds sought coverage under a policy containing materially the same language as the policy at issue here. The Supreme Court of Wisconsin held that the policy did not apply, because the insureds' provision of the wrong type of bacteria did not cause "property damage." It reasoned that the tablets were an integrated system, and under the integrated-system rule, damage to the tablets caused by the insureds' bacteria was damage to the tablets themselves, not damage to other property.

{¶ 13} We reject Motorists's argument that there was no "property damage" in this case. Under the plain language of the umbrella policy, Owens's claims against Ironics are for "property damage." As a legal theory, the integrated-system rule is applied by courts to determine whether the economic-loss doctrine, which is discussed later in this opinion, bars recovery on a tort claim. There is no reason to apply that rule to the present case.

### a. Owens's claims against Ironics are for "property damage"

{¶ 14} In determining whether the umbrella policy covers Owens's claims, we look to the language of the agreement. "[W]here the terms in an existing contract are clear and unambiguous, this court cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander*, 53 Ohio St.2d at 246, 374 N.E.2d 146; *see also Westfield Ins. Co. v. Custom Agri Sys., Inc.*, 133 Ohio St.3d 476, 2012-Ohio-4712, 979 N.E.2d 269, ¶ 11

("The issue we must decide is whether the * * * policy in the present case provides coverage"). By contrast, when terms in an insurance contract are ambiguous—that is, when they are susceptible to more than one reasonable interpretation—they will ordinarily be interpreted against the insurer and in favor of the insured. *See Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, at ¶ 13-14.

{¶ 15} The meaning of the term "property damage" in the umbrella policy is clear and unambiguous. "Property damage" is defined in the policy to include "[p]hysical injury to or destruction of tangible property * * *, including all resulting loss of use of that property." Applying the provision here, Owens's glass containers are "tangible property" and Ironics's contaminated tube scale caused "[p]hysical injury to or destruction of" Owens's containers. The claims for which Ironics seeks coverage are based clearly and simply on "property damage."

{¶ 16} Motorists's argument that the "tangible property" injured or destroyed here is Ironics's product and not property *other than* the insured's own product does not have merit. Multicomponent objects such as glass containers are ubiquitous and not identifiable as any particular component. A microchip, battery, or other component of a smart phone is not the equivalent of a smart phone itself. Owens's glass containers are likewise property other than Ironics's tube scale. While the property *includes* Ironics's tube scale, it is the integration of the tube scale into Owens's product that caused the damage—more than 1,850 tons of unusable glass containers.

{¶ 17} Moreover, we agree with Ironics and Owens that there is "property damage" here when we look at the coverage provisions in the context of the entire policy. *See CPS Holdings*, 115 Ohio St.3d 306, 2007-Ohio-4917, 875 N.E.2d 31, at ¶ 7 ("We examine the insurance contract as a whole"). The policy's impaired-property exclusion provides that the policy does not cover " '[p]roperty damage' to 'impaired property' * * * arising out of * * * [a] defect, deficiency, inadequacy or dangerous condition in 'your product.' " The contract defines "your product" as

"[a]ny goods or *products*, other than real property, *manufactured, sold, handled or distributed or disposed of by * * * * [y]ou.*" (Emphasis added.) So in this case, Ironics's tube scale falls under the definition of "your product." "Impaired property" is defined within the policy as

> tangible property [here—Owens's glass containers], *other than* "*your product*" or "your work" that *cannot be used* or is less useful because:
>
> 1. It *incorporates* "*your product*" [*here—tube scale*] or "your work" that is known or *thought to be defective*, [here—*tube scale contaminated with RHM stones*] deficient, inadequate or dangerous; * * *
>
> * * *
>
> *if such property can be restored to use by*:
>
> 1. The *repair, replacement, adjustment or removal of* "*your product*" or "your work."

(Emphasis added.) As we explain below, the final provision—"if such property can be restored to use by * * * [t]he repair, replacement, adjustment or removal of 'your product' "—causes the exclusion not to apply here, since the evidence in the record is that the glass containers had to be scrapped because they were more likely to crack with the contaminated tube scale as an integrated component. Nothing in the record shows a conceivable way to repair, replace, adjust, or remove the tube scale after it was incorporated into the glass containers manufactured by Owens. Nonetheless, the existence of this exclusion indicates that Owens's claims against Ironics involve "property damage" and that damage to Owens's containers is not the same as damage to Ironics's product.

**{¶ 18}** First, by making a distinction between the insured's product and a multicomponent product into which the insured's product is incorporated, the exclusion expressly recognizes that the former can cause damage to the latter by rendering it unusable or less useful. In other words, the provision indicates that damage to the multicomponent product is *not* to be viewed as merely damage to the insured's own product.

**{¶ 19}** Second, excluding coverage only when the property at issue "can be restored to use by * * * [t]he repair, replacement, adjustment or removal" of the insured's product necessarily implies that if the property at issue *cannot* be "restored to use," then coverage *is* provided. If that were not true, then the impaired-property exclusion would serve no purpose. Claims based on damage to tangible property caused by the incorporation of the insured's product could never be excluded under this provision, because they would not involve covered "property damage" in the first place.

**{¶ 20}** The exception's distinction between "your product" and "impaired property" provides support for the conclusion that Owens's claims are based on "property damage." Moreover, a contrary conclusion would render the impaired-property exclusion superfluous, and courts avoid interpretations of insurance-coverage provisions that render exclusions superfluous, *see, e.g.*, *First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.*, 688 F.Supp.2d 703, 707 (N.D.Ohio 2010) ("A contract is to be read as a whole, and if [the insurer's] position were correct, then the above exception would be surplusage without meaning"); *HoneyBaked Foods, Inc. v. Affiliated FM Ins. Co.*, 757 F.Supp.2d 738, 746 (N.D.Ohio 2010) ("It is unreasonable to construe the language as eliminating the seven exclusions directly following it when an alternative, recognized and reasonable interpretation exists"); *see also Andersen v. Highland House Co.*, 93 Ohio St.3d 547, 549, 757 N.E.2d 329 (2001), quoting *Home Indemn. Co. of New York v. Plymouth*, 146 Ohio St. 96, 64 N.E.2d 248 (1945), paragraph two of the syllabus (" 'where exceptions

* * * are introduced into an insurance contract, a general presumption arises to the effect that that which is not clearly excluded from the operation of such contract is included in the operation thereof.' * * * Thus, * * * if a policy does not plainly exclude a claim from coverage, then an insured may infer that the claim will be covered" [emphasis deleted and first ellipsis sic]).

{¶ 21} To the extent that Motorists suggests that there is no "property damage" here simply because Owens also seeks recovery for economic losses, we disagree. The key factor in the definition of "property damage" is the requirement that there be "[p]hysical injury to or destruction of tangible property." And as the Seventh District Court of Appeals has recognized, economic losses can provide " ' "a measure of damages to physical property." ' " *Am. Mfrs. Mut. Ins. Co. v. Den-Mat Cerinate Dental Laboratories*, 7th Dist. Mahoning No. 99 C.A. 123, 2001 WL 69176, *4 (Jan. 24, 2001), quoting *Giddings v. Indus. Indemn. Co.*, 112 Cal.App.3d 213, 219, 169 Cal.Rptr. 278 (1980), quoting *Hogan v. Midland Natl. Ins. Co.*, 3 Cal.3d 553, 562, 91 Cal.Rptr. 153, 476 P.2d 825 (1970); *see also Thee Sombrero, Inc. v. Scottsdale Ins. Co.*, 28 Cal.App.5th 729, 239 Cal.Rptr.3d 416 (2018) ("The correct principle, then, is *not* that economic losses, by definition, do not constitute property damage. * * * Rather, the correct principle is that losses that are *exclusively* economic, without any accompanying physical damage or loss of use of tangible property, do not constitute property damage" [emphasis sic]).

{¶ 22} Ultimately, we see no support for Motorists's interpretation of "property damage." Nothing in the term itself or in the term's definition in the policy indicates that damage to a multicomponent product is to be regarded as damage to the insured's product. If that were what the parties intended, Motorists could have included language in its umbrella policy making that intention clear, but it did not do so.

11

### b. Decisions in analogous cases support the finding that Owens's claims involve "property damage"

{¶ 23} Interpreting the term "property damage" to include Owens's claims is consistent with holdings in other cases applying Ohio law involving similar policy language and analogous facts. *See, e.g.*, *Parker Hannifin Corp. v. Steadfast Ins. Co.*, 445 F.Supp.2d 827 (N.D.Ohio 2006) (holding that defective gaskets used in television sets caused "property damage" where the defective gaskets caused some of the televisions to catch fire); *Transamerica Ins. Co. v. S.A.I. Marketing Co.*, 8th Dist. Cuyahoga No. 49256, 1985 WL 6860, *1, *5 (June 13, 1985) (holding that electrical capacitors incorporated into automotive-testing devices caused "property damage" where the capacitors were unable to handle the voltage in the testing devices, which rendered the devices unusable); *Moraine Materials Co., Inc. v. Ohio Cas. Ins. Co.*, 2d Dist. Montgomery No. 6284, 1979 WL 208510, *3 (Dec. 12, 1979) (holding that defective concrete used to construct a wall caused "property damage" where the wall had to be removed and replaced, as "it was impossible to separate the good from the bad").

{¶ 24} Courts applying the law of other states in cases involving similar insurance-contract language have reached the same conclusion. *See, e.g.*, *Harleysville Worcester Ins. Co. v. Paramount Concrete, Inc.*, 10 F.Supp.3d 252, 259, 263 (D.Conn.2014) (applying Connecticut law and holding that defective concrete integrated with components used in the construction of a swimming pool caused "property damage" where the defective concrete caused the pool walls to crack and leak); *Riceland Foods, Inc. v. Liberty Mut. Ins. Co.*, E.D.Ark. No. 4:10CV00091, 2011 WL 2262932, *1-2, *7 (June 8, 2011) (applying Arkansas law and holding that inclusion of "unapproved, unmarketable" genetically modified rice in a commercial rice supply caused "property damage" because the genetically modified rice rendered the supply unmarketable); *Natl. Union Fire Ins. Co. of Pittsburgh v. Terra Indus., Inc.*, 346 F.3d 1160, 1163-1165 (8th Cir.2003) (applying

Iowa law and holding that carbon dioxide contaminated with benzene incorporated into a third party's consumer-beverage products caused "property damage" where the benzene rendered the beverages unsuitable for human consumption, leading to a recall and the destruction of the beverages); *Zurich Am. Ins. Co. v. Cutrale Citrus Juices USA, Inc.*, M.D.Fla. No. 5:00-CV-149-OC-10GRJ, 2002 WL 1433728, *1, *3-4 (Feb. 11, 2002) (applying Florida law and holding that when juice that had been contaminated with propylene glycol was mixed with other juices to create a juice blend, it caused "property damage" *both* when the blended juice was destroyed *and* when the adulteration meant the blended juice was simply mislabeled and could still be marketed under another label); *Fireman's Fund Ins. Co. v. Amstek Metal, L.L.C.*, N.D.Ill. No. 07 C 647, 2008 WL 4066096, *1, *7-8 (Aug. 27, 2008) (applying Illinois law and holding that defective wire used to make springs incorporated into transmission-spring packs caused "property damage" when the defect irreparably damaged the spring packs).

### c. We decline to adopt the integrated-system rule to determine whether a claim involves "property damage"

{¶ 25} As indicated above, Motorists's "property damage" argument is based on its contention that we should apply the integrated-system rule, as the Supreme Court of Wisconsin did in *Wisconsin Pharmacal*, 367 Wis.2d 221, 2016 WI 14, 876 N.W.2d 72. We decline to do so. This rule was developed in connection with the economic-loss doctrine, which is not at issue in this appeal but is designed to protect reliance on contracts. In short, applying the integrated-system rule in this case would undermine reliance on contracts, because Ironics seeks to rely on its agreement with Motorists and the only question is whether the agreement covers Owens's claims against Ironics and because applying the rule here would nullify an exclusion agreed to by the parties.

i. Adopting the integrated-system rule would undermine reliance on contracts

**{¶ 26}** Understanding the integrated-system rule first requires an understanding of the economic-loss doctrine. "The economic-loss rule generally prevents recovery in tort of damages for purely economic loss." *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 106 Ohio St.3d 412, 2005-Ohio-5409, 835 N.E.2d 701, ¶ 6. " '[T]he well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable.' " *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St.3d 40, 44, 537 N.E.2d 624 (1989), quoting *Nebraska InnKeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124, 126 (Iowa 1984). But the rule contains an exception: it does not bar recovery in tort when a defective product results in economic loss from injury to a person or damage to other property. *Id.* at paragraph two of the syllabus ("A commercial buyer seeking recovery from the seller for economic losses resulting from damage to the defective product itself may maintain a contract action for breach of warranty under the Uniform Commercial Code; however, in the absence of injury to persons or damage to other property, the commercial buyer may not recover for economic losses premised on tort theories of strict liability or negligence").

**{¶ 27}** The economic-loss doctrine is based on differences between tort law and contract law and it encompasses several key concepts. "On the one hand, our system is guided by the equitable policy of tort law that injured consumers should be entitled to recover from those who manufacture and distribute a defective product. On the other hand, fundamental principles of contract law teach us that parties to a commercial transaction should remain free to govern their own affairs." (Footnote omitted.) *Chemtrol* at 41-42. "Recovery in tort seeks to restore the plaintiff to where he was before the defendant's wrongful conduct injured him, whereas contract law seeks to put the plaintiff where he would be had the defendant

properly performed his duty under the contract." *Detroit Edison Co. v. NABCO, Inc.*, 35 F.3d 236, 239 (6th Cir.1994).

{¶ 28} The primary purpose of the economic-loss doctrine is to "maintain the line of demarcation between tort law and contract law" in situations in which both tort and contract theories could apply. *Lesiak v. Cent. Valley Ag Coop., Inc.*, 283 Neb. 103, 121, 808 N.W.2d 67 (2012).

> The concern is that if tort remedies were available where the losses suffered were only economic, then private ordering (contract law) would be less effective. If a party could simply avoid its contractual bargain by suing in tort, which often offers more generous terms of recovery, then the effectiveness of contract law would be reduced.

*Id.* The economic-loss doctrine therefore prevents "the tortification of contract law." *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 503 (Iowa 2011).

{¶ 29} The integrated-system rule helps determine whether the "other property" exception to the economic-loss doctrine applies in situations in which a defective component causes damage to a multicomponent product into which it is incorporated. *See generally* Goodman, Peacock & Rutan, *A Guide to Understanding the Economic Loss Doctrine*, 67 Drake L.Rev. 1, 37-38 (2019). Under the rule, a multicomponent product is viewed as an integrated system, so if a defective component causes damage to the system, the other-property exception to the economic-loss doctrine is not triggered. *Id.*; *see also* Restatement of the Law 3d, Torts, Products Liability, Section 21, Comment e (1998) ("when a component part of a machine or a system destroys the rest of the machine or system * * * [and] the product or system is deemed to be an integrated whole, courts treat such damage as harm to the product itself"). A majority of states have adopted this rule. *See* Goodman, Peacock & Rutan, 67 Drake L.Rev. at 39-40, fn. 280 (collecting cases).

The United States Supreme Court has endorsed the rule as a matter of maritime law, as well. *See E. River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 867-875, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986).

{¶ 30} The purpose of the integrated-system rule is practical: it prevents the economic-loss doctrine from being circumvented. If the purchaser of an integrated product could sue the manufacturer of a defective component for damage to the integrated product, then "the purchaser would be able to circumvent the economic loss rule by recovering in tort instead of being limited to contract remedies." *HDM Flugservice GmbH v. Parker Hannifin Corp.*, 332 F.3d 1025, 1031 (6th Cir.2003). " 'Since all but the very simplest of machines have component parts, [a contrary] holding would require a finding of "property damage" in virtually every case where a product damages itself. Such a holding would eliminate the distinction between warranty and strict products liability.' " (Brackets sic.) *E. River* at 867, quoting *N. Power & Eng. Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324, 330 (Alaska 1981).

{¶ 31} We see no reason to apply the integrated-system rule in the present case. The integrated-system rule was created to ensure that contract law does not "drown in a sea of tort," *E. River* at 866, but no concerns of that sort are presented here. Ironics is seeking to *rely* on its agreement—invoking its bargained-for right to defense and indemnification—and the only question before the court is whether the umbrella policy covers Owens's claims. Applying the integrated-system rule here therefore would not serve the purpose it was designed to serve. *See id.* at 867, 872-873 (acknowledging that the integrated-system rule is designed to ensure that the economic-loss doctrine is not circumvented, thereby protecting parties' ability to "set the terms of their own agreements"); *Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 216 Wis.2d 395, 573 N.W.2d 842, ¶ 13 (1998) (stating that the economic-loss doctrine is designed to "protect commercial parties' freedom to allocate economic risk by contract").

{¶ 32} In fact, applying the rule here to bar coverage would *undermine* the principle that parties to an agreement should be allowed to govern their relationship through the agreed-upon terms of a contract. Recall from the discussion above that coverage under the umbrella policy between Motorists and Ironics is excluded in situations involving impaired property, which is defined as

> tangible property, other than "your product" or "your work" that cannot be used or is less useful because:
>
> 1. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; * * *
>
> * * *
>
> if such property can be restored to use by:
>
> 1. The repair, replacement, adjustment or removal of "your product" or "your work."

We explain below that although Owens's containers could be considered "tangible property * * * that cannot be used * * * because * * * [i]t incorporates" Ironics's defective tube scale, this exclusion does not apply, because the containers cannot be "restored to use." Simply stated, through this exclusion, the parties have agreed on terms governing the allocation of risk in situations like the one presented here. Applying the integrated-system rule in this case to narrow the definition of "property damage" would enable Motorists to *avoid* the bargain it struck in the umbrella policy with respect to integrated property. We decline to undermine the parties' agreement by adopting the integrated-system rule to determine "property damage." Applying the rule here would introduce an unnecessary layer of analysis that is not needed to understand, interpret, or apply the plain language of Motorists's insurance policy.

ii. *Wisconsin Pharmacal* is not persuasive

**{¶ 33}** We also do not find *Wisconsin Pharmacal* to be persuasive. The court in that case held that the incorporation of the wrong type of bacteria into probiotic-supplement tablets did not cause "property damage," because under the integrated-system rule, damage to the tablets should be regarded as damage to the insureds' product itself. *Id.*, 367 Wis.2d 221, 2016 WI 14, 876 N.W.2d 72, at ¶ 27-37, 64-65. But in applying the integrated-system rule, that court did not have before it the factual circumstances involved here. Nor did it consider whether the purpose furthered by the economic-loss doctrine and the integrated-system rule— protecting reliance on contracts—would be furthered or undermined by applying the rule in an insurance-coverage context. It also did not consider whether the converse of the impaired-property exclusion implied that the policies covered the claims at issue. The only explanation the Wisconsin court offered for applying the integrated-system rule in an insurance-coverage case was that in a prior case applying the integrated-system rule as part of an economic-loss-doctrine analysis, it had also "discussed whether there was insurance policy coverage for the claimed damage." *Id.* at ¶ 32, citing *Wausau Tile, Inc. v. Cty. Concrete Corp.*, 226 Wis.2d 235, 266-269, 593 N.W.2d 445 (1999). However, to the extent that *Wausau Tile* relied on the integrated-system rule to determine whether "property damage" occurred, the opinion provides no more analysis than *Wisconsin Pharmacal*; it is entirely conclusory. *See Wausau Tile* at 249. It offers no explanation for its reliance on the rule beyond the purpose for which it was developed, i.e., ensuring that contract law does not "drown in a sea of tort," *E. River*, 476 U.S. at 866, 106 S.Ct. 2295, 90 L.Ed.2d 865.

**{¶ 34}** In *Wisconsin Pharmacal*, the Wisconsin Supreme Court also appears to contradict its own prior holding that insurance coverage turns not on the economic-loss doctrine, but on the language of the policy. *See Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 268 Wis.2d 16, 2004 WI 2, 673 N.W.2d 65, ¶ 6 ("The

18

economic loss doctrine generally operates to confine contracting parties to contract rather than tort remedies for recovery of purely economic losses associated with the contract relationship. *The doctrine does not determine insurance coverage, which turns on the policy language*" [emphasis added]); *1325 N. Van Buren, L.L.C. v. T-3 Group, Ltd.*, 293 Wis.2d 410, 2006 WI 94, 716 N.W.2d 822, ¶ 59 ("although the economic loss doctrine may limit a party to contract rather than tort remedies, *it does not determine insurance coverage*" [emphasis added]). Although the *Wisconsin Pharmacal* court noted that "the economic loss doctrine does not control a coverage dispute and therefore is not at issue," *id.* at ¶ 32, it did not explain why the integrated-system rule should be taken from the economic-loss-doctrine context and applied to determine issues of coverage.

**{¶ 35}** We also note that in the five years since *Wisconsin Pharmacal* was decided, not one court in another state has followed its holding. And in addition to the appellate court in the present case, at least one other court has expressly declined to do so. *Penn Natl. Sec. Ins. Co. v. Linkone SRC, L.L.C.*, E.D.N.C. No. 5:19-CV-106-D, 2021 WL 2345164, *7 (June 8, 2021) (stating that *Wisconsin Pharmacal* was "not controlling or persuasive authority in light of North Carolina [case] law").

**{¶ 36}** For these reasons, we find *Wisconsin Pharmacal*, 367 Wis.2d 221, 2016 WI 14, 876 N.W.2d 72, unpersuasive.

iii. Cases cited by Motorists do not require a contrary holding

**{¶ 37}** Motorists cites a number of cases that it claims support its assertion that the integrated-system rule should be applied in this case. We disagree. Several of the cases Motorists cites are plainly distinguishable. For example, two of the cases did not involve the incorporation of a defective component into a multicomponent product. *See United States Fire Ins. Co. v. Chardon Rubber Co.*, 6th Cir. No. 91-3306, 1992 WL 92671, *1, 4 (Apr. 23, 1992) (involving a defective product made only from rubber provided by the insured); *Fed. Ins. Co. v. Marlyn*

*Nutraceuticals, Inc.*, E.D.N.Y. No. 13-CV-0137, 2013 WL 6796162, *1, 6 (Dec. 19, 2013) (involving defective tablets made by the insured [defect was that they contained soy, when insured had represented to third party that they were soy-free] that were subsequently sold without modification by third party). In a third case cited by Motorists, the claim against the insured did not involve any allegation that the insured's defective product had caused any damage. *See Home Ins. Co. of Illinois v. OM Group, Inc.*, 1st Dist. Hamilton No. C-020643, 2003-Ohio-3666, ¶ 2-3, 10 (holding that when a preservative applied to utility poles to protect them from premature decay turned out to be defective and decay was caused by exposure to natural elements, "the basis of all the claims [against the insured] was that [the defective product] had simply failed as a preservative. Absent any allegation that [the product] had caused physical injury to property, there was no coverage under the first prong of the 'property damage' clause in the policies").

{¶ 38} Two of the cases cited by Motorists actually *support* a finding of "property damage" here because they acknowledge that "property damage" occurs where the incorporation of a defective product leads to the destruction of either other components of the finished product or the finished product itself. *See U.S. Metals, Inc. v. Liberty Mut. Group, Inc.*, 490 S.W.3d 20, 22, 28 (Tex.2015) (holding (1) that defective flanges welded to pipes in refinery diesel units did not cause "property damage," because no leaks [which could result in fire and explosion] had occurred before the defect was discovered and (2) that "property damage" was "unquestionably" caused where replacing the defective flanges required the destruction of other components of the diesel units); *Drake-Williams Steel, Inc. v. Continental Cas. Co.*, 294 Neb. 386, 396-398, 883 N.W.2d 60 (2016) (holding that defective rebar incorporated into concrete pile caps designed to support columns in an arena did not cause "property damage" when the defect reduced the amount of support the caps could provide but did not damage other components and the caps could be modified to provide the required amount of structural support, but also

acknowledging that "property damage" would have occurred if the defective rebar had led to the pile caps being "demolish[ed] and replac[ed]").

**{¶ 39}** Finally, Motorists cites a case involving defective frames used to make tennis rackets. *See Hamilton Die Cast, Inc. v. United States Fid. and Guar. Co.*, 508 F.2d 417, 418 (7th Cir.1975), fn. 1. The manufacturer of the tennis rackets was required to issue refunds to consumers who had purchased the rackets and to withdraw the remainder of its rackets from the market. *Id.* at 418-419. The manufacturer sued the supplier of the frames, and the supplier sought a declaration that the claim was covered under its insurance policy. The court held that the manufacturer's claim was for only intangible losses—loss of investment, loss of anticipated profits, and loss of goodwill—which meant that no "property damage" had occurred, because the policy provided that "property damage" must be tangible. *Id.* at 419. The court also rejected the insured's assertion that the defective frames had caused tangible property damage to the overall rackets, on the ground that no physical harm had come to any part of the rackets. *Id.* at 419-420.

**{¶ 40}** Ironics and Owens argue that *Hamilton Die Cast* is not relevant, because the defective frames simply did not cause damage to the overall rackets. We see no reason to decide if that is correct, however, because even if the case supports Motorists's position, it would not tip the balance of authority in Motorists's favor. As shown in sections II.C.1.a. and b. above, the plain language of the contract as well as the weight of authority supports the conclusion that Owens's claims involve "property damage" under Ironics's umbrella policy with Motorists.

**{¶ 41}** For these reasons, we conclude that Owens's claims involve "property damage" under the umbrella policy.

*2. Was there an "accident"?*

**{¶ 42}** As noted above, the umbrella policy applies when there is an "occurrence." The umbrella policy defines "occurrence" as "[a]n accident, or a

happening or event * * * which results in * * * 'property damage' neither expected nor intended from the standpoint of the insured." Motorists argues that Ironics's providing contaminated tube scale was not an "accident," because it was not unexpected. Its argument is based on the principle of fortuity and our decision in *Custom Agri*, 133 Ohio St.3d 476, 2012-Ohio-4712, 979 N.E.2d 269.

### a. The principle of fortuity and Custom Agri

{¶ 43} The principle of fortuity is " ' "central to the notion of what constitutes insurance." ' " *Custom Agri* at ¶ 13, quoting *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 74 (Ky.2010), quoting 46 Corpus Juris Secundum, Insurance, Section 1235 (2009). The parties to an insurance agreement "in effect, wager against the occurrence or non-occurrence of a specified event; the carrier insures against a risk, not a certainty." *Bartholomew v. Appalachian Ins. Co.*, 655 F.2d 27, 29 (1st Cir.1981). Given this, courts have recognized that the principle of fortuity can be both an inherent requirement of every insurance contract and a specified requirement reflected in particular terms agreed to by the parties. *See* 3 Peritz, *Law and Practice of Insurance Coverage Litigation*, Section 35:3 (July 2021), quoting Robert Keeton, *Insurance Law*, Section 5.4(a), at 288 (1971) (" 'A requirement that loss be accidental in some sense in order to qualify as the occasion for liability of an insurer is implicit, when not express, because of the very nature of insurance' ").

{¶ 44} Our decision in *Custom Agri* recognized that the principle of fortuity is reflected in a policy's definition of "occurrence." In that case, we considered whether a commercial general-liability insurance policy covered a claim that the insured had constructed a defective steel grain bin. *Id.* at ¶ 2. The policy provided coverage for an "occurrence," which it defined as an "accident." *Id.* at ¶ 9. We therefore had to determine whether the construction of the steel grain bin constituted an "accident."

**{¶ 45}** We began by making several observations about what commercial general-liability policies are intended to cover and what they are not intended to cover. We stated that they "are not intended to insure 'business risks' * * *—risks that are the ' " 'normal, frequent, or predictable consequences of doing business, and which business management can and should control or manage.' " ' " *Id.*, 133 Ohio St.3d 476, 2012-Ohio-4712, 979 N.E.2d 269, at ¶ 10, quoting *Heile v. Herrmann*, 136 Ohio App.3d 351, 353, 736 N.E.2d 566 (1st Dist.1999), quoting *Columbia Mut. Ins. Co. v. Schauf*, 967 S.W.2d 74, 77 (Mo.1998), quoting James T. Hendrick and James P. Wiezel, *The New Commercial General Liability Forms— An Introduction and Critique*, Fedn. of Ins. & Corporate Counsel Quarterly, 319, 322 (Summer 1986). Instead, they "generally insure consequential risks that stem from the insured's work," not "an insured's work itself." *Id.*, quoting *Heile* at 353.

**{¶ 46}** We then turned to the language of the policy in that case. We noted that the word "accident" was not defined, so we gave the word its natural and commonly accepted meaning, which we had previously held to be " 'unexpected, as well as unintended.' " *Id.* at ¶ 12-13, quoting *Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St.3d 657, 666, 597 N.E.2d 1096 (1992). We also observed that the term "accidental" incorporates the concept of fortuity, and we stated that "in the construction context," that means " '[t]he key issues are whether the contractor controlled the process leading to the damages and whether the damages were anticipated.' " (Emphasis deleted.) *Id.* at ¶ 13, quoting *JTO, Inc. v. State Auto. Mut. Ins. Co.*, 194 Ohio App.3d 319, 2011-Ohio-1452, 956 N.E.2d 328, ¶ 32-33 (11th Dist.).

**{¶ 47}** Based on these observations, we held that the risk that faulty or defective work performed by the insured will cause property damage is an ordinary business risk that can be expected. *Id.* at ¶ 10, 14-15. The policy therefore did "not provide coverage to [the insured] for its alleged defective construction of and workmanship on the steel grain bin." *Id.* at ¶ 14.

**{¶ 48}** We subsequently extended the rule of *Custom Agri,* 133 Ohio St.3d 476, 2012-Ohio-4712, 979 N.E.2d 269, to construction cases involving defective work performed by a subcontractor of the insured. *Ohio N. Univ. v. Charles Constr. Servs., Inc.*, 155 Ohio St.3d 197, 2018-Ohio-4057, 120 N.E.3d 762. The insured in *Ohio N.* was a general contractor hired to construct a university hotel and conference center, and the claims for which it sought coverage were based on faulty workmanship by a subcontractor it had hired. *Id.* at ¶ 4, 6-7. We held that the risk that a subcontractor's faulty or defective work will cause property damage is an ordinary business risk that can be expected, so claims based on such work do not involve an "occurrence." *Id.* at ¶ 27.

### b. The parties' arguments

**{¶ 49}** In the present case, the parties agree that the phrase "neither expected nor intended" in the umbrella policy's definition of "occurrence" reflects an intent to include the principle of fortuity into the agreement. They disagree, however, over whether *Custom Agri* applies to this case.

**{¶ 50}** Motorists argues that *Custom Agri* controls this case because selling contaminated tube scale is just like performing faulty or defective work in that "the risk of selling a contaminated product is a normal, frequent, and predictable business risk which is under the sole control of Ironics." A contrary conclusion, it argues, would inappropriately convert the umbrella policy here from an insurance policy based on contingent risks into a performance bond pursuant to which Motorists is expected to essentially guarantee that Ironics's products will be free from any defects.

**{¶ 51}** Ironics and Owens respond that *Custom Agri*, 133 Ohio St.3d 476, 2012-Ohio-4712, 979 N.E.2d 269, *Ohio N.*, 155 Ohio St.3d 197, 2018-Ohio-4057, 120 N.E.3d 762, and other cases relied on by Motorists do not apply here, because those cases involved the construction industry, the claims at issue were based on faulty or defective workmanship, and the courts focused on the control the insured

had over the performance and quality of the work. Ironics and Owens argue that performing defective work and providing a defective or nonconforming product are materially different, and liability policies treat them differently as a result, which can be seen in the separate exclusions of coverage for "your work" and "your product."

{¶ 52} The parties also dispute whether the facts here show that Ironics had sufficient control over the processes that led to Owens's glass containers being scrapped to warrant the conclusion, under the reasoning of *Custom Agri*, that the damage to the containers was not "unexpected" under the umbrella policy. Ironics emphasizes that it did not have control over the screening process for the raw tube scale or the integration of the tube scale into Owens's containers. Motorists responds that Ironics "could and should have controlled the quality of product it provided to its customer" by inspecting, testing or otherwise ensuring that it was not contaminated.

### c. Owens's claims arose out of an "occurrence"

{¶ 53} We agree with Ironics and Owens that *Custom Agri* and *Ohio N.* do not control the outcome of this case and that the claims against Ironics are based on an "occurrence," that is, they are based on an accident that resulted in " 'property damage' neither expected nor intended from the standpoint of the insured." In our view, the dispositive fact is that Owens's claims are based on Ironics's supplying Owens with contaminated tube scale that caused Owens's glass containers to be more likely to crack and therefore to be unusable.

{¶ 54} The disputes before the court in *Custom Agri* and *Ohio N.* involved claims based on damage to the insured's construction work—a steel grain bin in *Custom Agri* and a hotel in *Ohio N.* In *Custom Agri*, we repeatedly made clear that although commercial general-liability policies are not intended to insure an insured's work itself, they " 'are intended to insure the risks of an insured causing damage to other persons and their property.' " *Custom Agri*, 133 Ohio St.3d 476,

2012-Ohio-4712, 979 N.E.2d 269, at ¶ 10, quoting *Heile*, 136 Ohio App.3d at 353, 736 N.E.2d 566. In other words, these policies " 'generally insure consequential risks that stem from the insured's work.' " *Id.*, quoting *Heile* at 353. We also cited approvingly decisions from other jurisdictions making similar observations. *Id.*, citing *ACUITY v. Burd & Smith Constr., Inc.*, 2006 ND 187, 721 N.W.2d 33, ¶ 12 ("A CGL policy does not insure the insured's work itself; rather, it insures consequential damages that stem from that work") and *Century Indemn. Co. v. Golden Hills Builders, Inc.*, 348 S.C. 559, 566, 561 S.E.2d 355 (2002), *overruled on other grounds*, *Crossmann Communities of N. Carolina, Inc. v. Harleysville Mut. Ins. Co.*, 395 S.C. 40, 45, 717 S.E.2d 589 (2011), quoting Rowland H. Long, *The Law of Liability Insurance*, Section 10.01[1] (2001) (commercial general-liability policies " 'generally insure consequential risks that stem from [an insured's] work' "). And when discussing the meaning of the term "accident," we noted the distinction again. *See Custom Agri* at ¶ 13, quoting *JTO*, 194 Ohio App.3d 319, 2011-Ohio-1452, 956 N.E.2d 328, at ¶ 32-33, quoting *Indiana Ins. Co. v. Alloyd Insulation Co.*, 2d Dist. Montgomery No. 18979, 2002-Ohio-3916, ¶ 27 (" ' "[F]aulty workmanship claims generally are not covered, *except for their consequential damages*, because they are not fortuitous. In short, contractors' 'business risks' are not covered by insurance, *but derivative damages are*." ' " [Emphasis added]). Our decision in *Ohio N.* reaffirmed this principle. *See Ohio N.*, 155 Ohio St.3d 197, 2018-Ohio-4057, 120 N.E.3d 762, at ¶ 14.

{¶ 55} Other courts have also found that claims arose out of an "accident" when they were based on damage to the property of another. In one case, the insured performed faulty work on the shell of a large kiln, which resulted in damage to other components of the kiln when it was restarted, necessitating repeated shutdowns for repairs. *Burlington Ins. Co. v. PMI Am., Inc.*, 862 F.Supp.2d 719, 723-724 (S.D.Ohio 2012). The court observed that "an 'occurrence' in a commercial general liability policy 'will not provide coverage if faulty workmanship *is* the

accident, but will provide coverage if faulty workmanship *causes* the accident' and there is collateral damage to property other than the insured's work product." (Emphasis added.) *Id.* at 728, quoting *Paramount Parks, Inc. v. Admiral Ins. Co.*, 12th Dist. Warren No. CA2007-05-066, 2008-Ohio-1351, ¶ 26. It then held that the claim against the insured arose out of an "accident" because the insured's work caused damage to the other components of the kiln and rendered it inoperable, and the owner of the kiln did not seek or obtain damages for the defects in the shell of the kiln worked on by the insured. *Id.* at 726, 728. *See also Indiana Ins. Co.*, 2002-Ohio-3916, at ¶ 2, 30-31 (finding that corrosion and related property damage caused by defective construction of a roof by insured constituted an "occurrence" under insurance policy because the damage was a consequence of the defective construction).

{¶ 56} Courts in other jurisdictions considering this same type of claim—a claim based on damage caused when a defective or nonconforming product is incorporated into a larger product—have also held that the claim arises out of an "accident." In one case from New York, the insured supplied apples to a company that made baby food, and when it was discovered that the apples were contaminated with rodenticide, the company removed the affected baby food from commerce and sued the insured. *Thruway Produce, Inc. v. Massachusetts Bay Ins. Co.*, 114 F.Supp.3d 81, 84-85 (W.D.N.Y.2015). The insured then sought coverage under two liability policies providing coverage for "property damage" caused by an "occurrence," which the policies defined to mean an "accident." *Id.* at 85-86. The court observed, "The record does not contain any evidence or even any argument that [the insured] intended or knew that the apples [it] supplied to [the baby-food manufacturer] were contaminated or would contaminate the baby-food product." *Id.* at 91. As a result, it held that the damages at issue arose out of an "occurrence" because "the unexpected and unintended contamination of the apples * * * resulted

in damage to the baby-food product, into which the apples were inextricably incorporated." *Id.*

{¶ 57} In another case from New York, the court considered a claim based on an insured's sale of apple-juice concentrate that unbeknownst to the insured was contaminated and therefore ruined juice products into which it was incorporated. *Chubb Ins. Co. of New Jersey v. Hartford Fire Ins. Co.*, S.D.N.Y. No. 97 Civ. 6935, 1999 WL 760206, *1 (Sept. 27, 1999). The court noted that under New York caselaw, when an "insured unintentionally sells a product that is allegedly defective and that is incorporated into a third-party's finished product, the resulting impairment to the finished product is an 'occurrence.' " *Id.* at *4. Based on that determination, it concluded that the claim was covered because the insured's sale of contaminated apple-juice concentrate caused unintended and unexpected damage to the juice products and therefore the claim arose out of an "occurrence." *Id.* at *4-9.

{¶ 58} A third case, from California, is along the same lines. *See Ritchie v. Anchor Cas. Co.*, 135 Cal.App.2d 245, 286 P.2d 1000 (1955). The insured sold rancid peanut oil to a company that made corn chips. *Id.* at 248-249. After the company discovered that the peanut oil was rancid, a dispute arose between the insured and the insurer over whether the company's claim against the insured was based on an "accident," which included an event that was unexpected and unintended. *Id.* at 252-253. The court of appeals held that it was. Among other things, the court noted that the peanut oil that the insured previously sold to the company had been satisfactory and that the company did not know that the more recently purchased peanut oil was rancid when it used it. *Id.* at 251-252. The company's damages also consisted of refunds to customers who had purchased unusable food products, plus testing and cleaning costs. *Id.* "In short," the court stated, the claim "alleges use of rancid oil in the belief that it was sweet, with the unexpected result that the oil ruined all food products in which it was used, and

damaged the machinery employed in the manufacture of same." *Id.* at 252. The sale of rancid peanut oil was therefore unexpected and constituted an "accident," requiring coverage under the policy. *Id.*

**{¶ 59}** The claims in the present case are materially the same as the claims in *Thruway*, 114 F.Supp.3d 81, *Chubb*, and *Ritchie*. There is no evidence in the record that Ironics was aware of any contamination to the tube scale it provided to Owens. In fact, Motorists alleged in its complaint that Ironics was *not* aware of the contamination. There is likewise no evidence that Ironics had control over the process by which Owens used that tube scale to make glass containers. According to an affidavit by Owens's "technical-capabilities leader" that was submitted by Owens in opposition to summary judgment, the incorporation of the contaminated tube scale into Owens's glass containers rendered the containers unusable because they were more likely to break and it was not possible to remove the contamination or otherwise make the containers safe to use, so the containers had to be scrapped.

**{¶ 60}** Finally, with respect to the damages sought by Owens, although we are not able to review the alleged damages in detail because Owens has not yet filed suit against Ironics, we are nonetheless aware of the general nature of those damages because of a stipulation entered into by Motorists, Ironics, and Owens. According to the parties' stipulation, Owens is alleging "damages in excess of $1,000,000 consisting of lost production and sales, freight, inventory write-off, testing and shipping costs, incremental labor, and other damages." According to an affidavit by Owens's "business unit finance director" that was submitted by Owens in opposition to summary judgment, the damages Owens seeks are "primarily composed of the costs that it incurred to manufacture the glass containers that were damaged by the chrome stones and were scrapped." Although *Custom Agri*, 133 Ohio St.3d 476, 2012-Ohio-4712, 979 N.E.2d 269, *Ohio N.*, 155 Ohio St.3d 197, 2018-Ohio-4057, 120 N.E.3d 762, and *Burlington*, 862 F.Supp.2d 719, make clear that Ironics would not be entitled to coverage if Owens simply

sought damages for the cost of procuring replacement tube scale, the damages sought by Owens clearly go far beyond that. They are based on the damage caused to Owens's containers, including the loss of the other components of the containers when the containers were scrapped.

{¶ 61} The present case is therefore similar to *Thruway*, *Chubb*, and *Ritchie*, 135 Cal.App.2d 245, 286 P.2d 1000. In line with those decisions, we conclude that Ironics's provision of contaminated tube scale resulted in property damage that was neither expected nor intended from the standpoint of the insured. If Motorists believes that claims such as those at issue here should not be covered under the terms of its policy, it remains free to seek agreement to language indicating such in its future contracts, consistent with applicable law.

{¶ 62} For these reasons, we conclude that Owens's claims arose out of an "occurrence" under the umbrella policy between Motorists and Ironics.

### D. Do any of the policy exclusions apply?

{¶ 63} In its final argument, Motorists asserts that three exclusions in the umbrella policy apply to bar coverage for Owens's claims—the impaired-property exclusion, which we discussed above, and exclusions for "your product" and "your work." These three exclusions are known as business-risk exclusions, and they are included in commercial general-liability policies " 'for the express purpose of excluding coverage for risks relating to the repair or replacement of the insured's faulty work or products, or defects in the insured's work or product itself.' " *See Oxford Aviation, Inc. v. Global Aerospace, Inc.*, 680 F.3d 85, 89-90 (1st Cir.2012), quoting Russ & Segalla, *Couch on Insurance*, Section 129.16 (3d Ed.2005). Whether any of these exclusions applies in any given case depends on the circumstances surrounding the claim and the language contained in the applicable policy.

{¶ 64} First, we conclude that the "your product" exclusion does not apply in this case. The umbrella policy provides that it "does not apply to" " '[p]roperty

damage' to 'your product' arising out of it or any part of it."  "Your product" is defined in relevant part as "[a]ny goods or products, other than real property, manufactured, sold, handled or distributed or disposed of by * * * [y]ou."  This exception does not apply, because Ironics's "product" is the contaminated tube scale and Owens's claims are not for " 'property damage' to" Ironics's tube scale. They are for damage to Owens's glass containers, which had to be scrapped. Although Motorists argues that Owens's glass containers should be considered Ironics's product, we have already rejected that argument.

{¶ 65} Second, we conclude that the "your work" exclusion does not apply. Motorists's policy provides that it "does not apply to" " '[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.' "  "Your work" is defined in relevant part as "[w]ork or operations performed by you or on your behalf; and * * * [m]aterials, parts or equipment furnished in connection with such work or operations."  The "your work" exception does not apply, because Ironics only provided a product to Owens. It did not perform work for Owens.

{¶ 66} Finally, we conclude that the "impaired property" exclusion does not apply.  The policy provides that it "does not apply to" " '[p]roperty damage' to 'impaired property' or property that has not been physically injured, arising out of * * * [a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work.' "  "[I]mpaired property" is defined in relevant part as

> tangible property, other than "your product" or "your work"
that cannot be used or is less useful because:
>
> 1. It incorporates "your product" or "your work" that is
known or thought to be defective, deficient, inadequate or
dangerous; * * *
> if such property can be restored to use by:

1. The repair, replacement, adjustment or removal of "your product" or "your work"; or

2. Your fulfilling the terms of the contract or agreement.

**{¶ 67}** Owens's containers are tangible property that cannot be used, because they incorporate Ironics's defective tube scale. But the impaired-property exclusion does not apply in this case, because Owens's glass containers could not be restored to use by the repair, replacement, adjustment, or removal of the contaminated tube scale. As noted, Owens's technical-capabilities leader submitted an affidavit stating that once the contaminated tube scale was incorporated into Owens's glass containers, it was not possible to remove the contamination or otherwise restore the containers to use, so they had to be scrapped. None of the three exclusions identified by Motorists bars coverage for Owens's claims.

## III. CONCLUSION

**{¶ 68}** For these reasons, we hold that Owens's claims arose out of an "occurrence," that is, they arose out of an accident that resulted in "property damage" under Ironics's umbrella policy with Motorists, and that none of the policy's exclusions applies. Accordingly, we affirm the judgment of the Sixth District.

Judgment affirmed.

O'CONNOR, C.J., and DONNELLY and STEWART, JJ., concur.

DEWINE, J., concurs in judgment only, with an opinion joined by KENNEDY, J.

FISCHER, J., concurs in judgment only in part and dissents in part, with an opinion.

_____

**DEWINE, J., concurring in judgment only.**

**{¶ 69}** I agree with the majority that Ironics is entitled to coverage under the umbrella policy issued by Motorists Mutual. But in my view, a straightforward application of the policy language is all that is necessary to resolve this case.

## I. Background

**{¶ 70}** Motorists Mutual Insurance Company and Ironics, Inc., are parties to an insurance contract that includes both a commercial general-liability ("CGL") policy and an umbrella policy. Owens-Brockway Glass Container, Inc. ("Owens") is also involved in this dispute.

**{¶ 71}** Ironics supplied Owens with tube scale—a by-product of steel production that is used to give glass bottles an amber-brown color. The tube scale was defective. Unbeknownst to Ironics, some raw tube scale had fallen on the ground when it was being screened by a subcontractor and had become contaminated with chrome stones. This contaminant was not discovered until after Owens used the tube scale to manufacture a raft of amber-tinted bottles. As a result, 1,850 tons of glass bottles had to be scrapped.

**{¶ 72}** Ironics contacted Motorists Mutual, seeking defense and liability coverage under their insurance agreement. Motorists Mutual filed a declaratory judgment action against Ironics, seeking a declaration that it had no duty to cover the mishap. The trial court granted Motorists Mutual summary judgment, concluding that coverage was not available under either the CGL policy or the umbrella policy. The court of appeals agreed that Ironics was not entitled to coverage under the CGL policy but found that coverage was available under the umbrella policy.

**{¶ 73}** Motorists Mutual appealed, and this court agreed to review the following legal proposition:

> The incorporation of a defective ingredient into an integrated product or system does not constitute damage to "other" property for purposes of liability coverage under commercial general liability and umbrella policies.

*See* 158 Ohio St.3d 1504, 2020-Ohio-2819, 144 N.E.3d 444.

## II. Only the umbrella policy is under review

{¶ 74} As the procedural history of this case makes clear, the applicability of the CGL policy is not before this court. The court of appeals held that "Ironics is not entitled to coverage under the CGL policy." 2020-Ohio-137, 151 N.E.3d 1001, ¶ 29. That portion of its judgment favored Motorists Mutual. Naturally, Motorists Mutual did not ask this court to review that holding. Neither did Ironics. Ironics could have filed a cross-appeal challenging the court of appeals' decision as to the CGL policy. S.Ct.Prac.R. 6.01(C). But it chose not to.

{¶ 75} The parties' briefing confirms their understanding that the CGL policy is not before this court. In its memorandum opposing jurisdiction, Ironics endorsed the reasoning of the court of appeals, stating that it was "entirely consistent with well-established insurance law" to confer broader coverage under an umbrella policy than under a CGL policy. The CGL policy is referenced only tangentially in the merits briefing—and only for purposes of comparison or contrast with the umbrella policy. Nor did the CGL policy feature in the oral argument.

{¶ 76} Even though the CGL policy's application was not presented as a live issue before this court, the partial dissent would find insurance coverage under the CGL policy. It reasons that Motorists Mutual has "standing" to challenge the court's judgment on that issue. But standing is largely beside the point. The problem here is one of presentation. *Uncapher v. Baltimore & Ohio RR. Co.*, 127 Ohio St. 351, 356, 188 N.E. 553 (1933) ("notwithstanding the assignments contained in the petition in error[,] [e]rrors not treated in the brief will be regarded

as having been abandoned by the party who gave them birth"). The partial dissent answers a question that no one has asked: neither party sought reversal of the court of appeals' decision that the CGL policy did not provide coverage. The partial dissent is an advisory opinion on an issue that is not in front of us.

### III. The umbrella policy covers Ironics's claim

{¶ 77} The only question before this court is whether the umbrella policy covers Ironics's claim. The plain language of the insurance contract supplies the answer.

### A. *By its terms, the umbrella policy covers the damage*

{¶ 78} Under the umbrella policy, Motorists Mutual agreed to insure against a loss resulting from an "occurrence" that causes "property damage." This coverage extends only to a loss not covered by Ironics's "underlying insurance."

{¶ 79} The quoted terms are defined as follows:

- Occurrence:

1. An accident, or a happening or event, including continuous or repeated exposure to conditions, which results in "bodily injury" or "property damage" neither expected nor intended from the standpoint of the insured.

- Property damage:

1. Physical injury to or destruction of tangible property which occurs during the policy period, including all resulting loss of use of that property;

2. Loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an "occurrence" during the policy period.

• Underlying insurance: policies listed in the Schedule of Underlying Insurance and other policies available to the Insured applicable to the "occurrence."

"Accident," as used in the definition of "occurrence," is not defined, so it takes on its ordinary meaning. An "accident" is an "unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated." *Black's Law Dictionary* 18-19 (11th Ed.2019); *see also Hybud Equip. Corp. v. Sphere Drake Ins. Co.*, 64 Ohio St.3d 657, 666, 597 N.E.2d 1096 (1992) ("In its common, ordinary use, the word 'accidental' means unexpected, as well as unintended").

**{¶ 80}** The facts fit neatly into this collection of definitions. First, the law of the case is that no "underlying insurance"—namely, the CGL policy—covers this claim.

**{¶ 81}** Second, the tube scale was *accidentally* manufactured to contain a contaminant ruinous to the bottles. The contamination of the glass with chrome particulate was unintended and unforeseen. Relying on *Westfield Ins. Co. v. Custom Agri Sys., Inc.*, 133 Ohio St.3d 476, 2012-Ohio-4712, 979 N.E.2d 269, ¶ 13, Motorists Mutual maintains that "accident" is a term of art that incorporates what insurance law calls the fortuity principle—the idea that damage must be " 'truly accidental' " to be covered, not a consequence of " 'faulty workmanship.' " *Custom Agri*, quoting *JTO, Inc. v. State Auto. Mut. Ins. Co.*, 194 Ohio App.3d 319, 2011-Ohio-1452, 956 N.E.2d 328, ¶ 32 (11th Dist.); *see also Ohio N. Univ. v. Charles Constr. Servs., Inc.*, 155 Ohio St.3d 197, 2018-Ohio-4057, 120 N.E.3d 762, ¶ 17. But here, unlike in *Custom Agri*, the loss was truly accidental. Owens scrapped its glass bottles because a subcontractor had inadvertently contaminated the tube scale. Ironics did not intend and could not have foreseen such a mishap,

and the loss was not a result of Ironics's faulty craftsmanship.  Thus, there was an occurrence (i.e., an accident that resulted in property damage).

{¶ 82} This occurrence rendered the glass bottles in question unusable. Motorists Mutual contends that the bottles were not destroyed.  But the definition of property damage includes the "[l]oss of use of tangible property."  Here, 3.7 million pounds of glass bottles could not be put to their intended use.  Thus, the defective tube scale inflicted property damage.  Ironics's claim is within the sweep of the umbrella policy.  Straightforward enough.

{¶ 83} But that does not complete the analysis because the umbrella policy contains "exclusions."  Motorists Mutual offers three as relevant.  The policy excludes coverage for "[p]roperty damage" (1) to "your product," (2) to "your work," and (3) to "impaired property."

{¶ 84} Start with the exclusion for property damage to "your product." "Your product" is defined as "[a]ny goods or products, other than real property, manufactured, sold, handled or distributed or disposed of by * * * [y]ou."  "You" in the definition of "your product" refers to Ironics, the insured.  Ironics's product is the tube scale.  The damaged product is the glass bottles manufactured by Owens. Motorists Mutual argues that the bottles are an integrated system of which the tube scale is a component and, therefore, the bottles should be considered Ironics's product too.  But Ironics has not "manufactured, sold, handled or distributed or disposed of" the bottles made by Owens.  Thus, the "your product" exclusion does not exclude coverage for damage to the bottles.

{¶ 85} Next, turn to the exclusion for property damage to "your work."  The relevant definition is as follows:

> • Your work:
>
> 1. Work or operations performed by you or on your behalf;

and

> 2. Materials, parts or equipment furnished in connection with such work or operations.

Ironics did not perform "work" for Owens. It did not, for example, participate in the implementation of the tube scale into the other glass ingredients. Ironics simply supplied a product. Ironics did "furnish[]" "materials," but not "in connection with" any "work."

{¶ 86} Finally, there is the "impaired property" exclusion. That exclusion defines "impaired property" as

> tangible property, other than "your product" or "your work" that cannot be used or is less useful because:
>
> 1. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> 2. You have failed to fulfill the terms of a contract or agreement;
>
> if such property can be restored to use by:
>
> 1. The repair, replacement, adjustment or removal of "your product" or "your work"; or
>
> 2. Your fulfilling the terms of the contract or agreement.

Here, the glass bottles are "tangible property" that "incorporates" Ironics's "product"—the tube scale. But the exclusion does not apply, because the property cannot "be restored to use." The bottles were necessarily scrapped.

{¶ 87} Thus, it is clear from the four corners of the umbrella policy that Motorists Mutual agreed to cover Ironics's liability and that no exclusion applies.

### *B. There is no need to venture beyond the language of the policy*

{¶ 88} The majority opts to use this case to write something of a treatise on insurance law. It invokes various insurance doctrines and cites numerous cases from other jurisdictions. But while it may conceivably interest some to know that the economic-loss doctrine "prevents 'the tortification of contract law,' " majority opinion at ¶ 28, quoting *Annett Holdings, Inc. v. Kum & Go, L.C.*, 801 N.W.2d 499, 503 (Iowa 2011), or that the integrated-systems rule preserves the " ' "distinction between warranty and strict products liability," ' " *id.* at ¶ 30, quoting *E. River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 867, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), quoting *N. Power & Eng. Corp. v. Caterpillar Tractor Co.*, 623 P.2d 324, 330 (Alaska 1981), none of this is necessary to resolve this dispute about the meaning of a contract. The majority's musings are simply dicta.

### IV. Conclusion

{¶ 89} Under the plain language of the contract in front of us, Ironics is entitled to coverage under the umbrella policy. The majority digresses well beyond the contractual language, but ultimately ends up with the right result. Consequently, I concur in judgment only.

KENNEDY, J., concurs in the foregoing opinion.

––––––––––––––

**FISCHER, J., concurring in judgment only in part and dissenting in part.**

{¶ 90} In this case, we are asked to decide whether there is insurance coverage for a claim by a supplier whose defective product was incorporated in the production process of a third-party manufacturer and then caused damage to that manufacturer's final product.

{¶ 91} I agree with the majority opinion that—absent an exclusion or endorsement stating otherwise—there is coverage in this case. I disagree, however, with the majority opinion's decision to find that coverage under only the umbrella policy. Unlike the majority opinion, I would find that this particular claim is

covered first and foremost under the commercial general-liability ("CGL") policy in place at the time. Accordingly, for the reasons set forth more fully below, I respectfully concur in judgment only in part and dissent in part.

## I. THE INSURING AGREEMENTS

{¶ 92} Appellee Ironics, Inc., purchased a single policy agreement, policy 33.300545-90E, ("the agreement") from Motorists Mutual Insurance Company, appellant, that included a CGL policy and an umbrella policy. The main insuring policy in the agreement between Motorists and Ironics is the CGL policy, which provides that "[Motorists] will pay those sums that [Ironics] becomes legally obligated to pay as damages because of * * * 'property damage' to which this insurance applies." As relevant here, the CGL policy goes on to state that it covers property damage "caused by an 'occurrence.'" The umbrella policy included in the agreement provides that Motorists will pay all sums that Ironics is legally obligated to pay as damages "[i]n excess of the [CGL's policy limits]" or "[f]or an 'occurrence' covered by this policy which is either excluded or not covered by the [CGL policy]."

{¶ 93} Given the policy language involved here, the CGL policy sits in a primary position. It is only if the CGL's policy limits are exhausted or if there is a gap in the CGL policy's primary coverage, which the umbrella policy would then drop down to fill, that the umbrella policy is applicable. *See Cincinnati Ins. Co. v. CPS Holdings, Inc.*, 115 Ohio St.3d 306, 2007-Ohio-4917, 875 N.E.2d 31, ¶ 5.

## II. STANDING

{¶ 94} This court accepted jurisdiction over a single proposition of law raised by Motorists, under which it argues that the incorporation of a defective ingredient does not constitute damage under the CGL and umbrella policies in the agreement. *See* 158 Ohio St.3d 1504, 2020-Ohio-2819, 144 N.E.3d 444. The proposition of law specifically states, "The incorporation of a defective ingredient into an integrated product or system does not constitute damage to 'other' property

40

for purposes of liability coverage under *commercial general liability* and umbrella policies." (Emphasis added.) So contrary to the concurring-in-judgment-only opinion, the issue of coverage under *both* policies is currently before our court.

{¶ 95} The majority opinion declines to address Motorists's argument under the CGL policy for a different reason than that expressed by the concurring-in-judgment-only opinion. In a footnote, the majority opinion concludes that Motorists lacks standing to challenge any issue related to the CGL policy because the court of appeals ultimately ruled in its favor on that issue. Majority opinion, ¶ 9, fn. 1. While there is some support for the assertion that a party who has prevailed on an issue in the court of appeals lacks standing to raise that issue before this court, this case does not present that scenario.

{¶ 96} This court has stated that standing to appeal requires only that the party have been aggrieved by *the final order* that is being appealed. *See Ohio Contract Carriers Assn. v. Pub. Util. Comm.*, 140 Ohio St. 160, 42 N.E.2d 758 (1942), syllabus; *In re Application of Suburban Natural Gas Co*., ___Ohio St.3d___, 2021-Ohio-3224, ___N.E.3d___, ¶ 42 (the party seeking reversal must show that it has been harmed by *the order*); *In re Application of Ohio Power Co.*, 155 Ohio St.3d 320, 2018-Ohio-4697, 121 N.E.3d 315, ¶ 9 A party is an "aggrieved party" when the party's "interest in the subject matter of the litigation is ' "immediate and pecuniary, and not a remote consequence of the judgment." ' " *Midwest Fireworks Mfg. Co., Inc. v. Deerfield Twp. Bd. of Zoning Appeals*, 91 Ohio St.3d 174, 177, 743 N.E.2d 894 (2001), quoting *Ohio Contract Carriers Assn.* at 161, quoting 2 American Jurisprudence, Appeal and Error, Section 50, at 942 (1936). Thus, the appealing party must be able to demonstrate a present interest in the subject matter of the litigation that has been prejudiced by the judgment appealed from. *Id.*

{¶ 97} It is true that this court may have, perhaps inadvertently, suggested that standing to appeal might be further limited. In dictum, this court has noted that

a party was restrained from raising a specific error in its appeal because it had benefitted from the error. *Dayton-Montgomery Cty. Port Auth. v. Montgomery Cty. Bd. of Revision*, 113 Ohio St.3d 281, 2007-Ohio-1948, 865 N.E.2d 22, ¶ 33. And in a footnote, this court has determined that a party lacked standing to challenge a specific portion of a lower court's holding because the party was not aggrieved by it. *State ex rel. Richardson v. Suster*, 130 Ohio St.3d 82, 2011-Ohio-4728, 955 N.E.2d 982, ¶ 1, fn. 1.

{¶ 98} What is clear from this court's jurisprudence is that the appealing party must be aggrieved by the final order and show a present interest in the subject matter of the litigation. *See Ohio Power Co.* at ¶ 9. Here, Motorists was aggrieved by the final order of the court of appeals because that order determined that the trial court erred in granting summary judgment to Motorists. And it is apparent that Motorists has a present interest in the subject matter of the litigation given that the interpretation of the agreement, which includes both the CGL and umbrella polices, dictates whether it will be responsible for coverage. Furthermore, in order to interpret the umbrella policy, one necessarily must interpret the CGL policy. As stated in the umbrella policy, Motorists will pay all sums that Ironics is legally obligated to pay as damages "[i]n excess of the [CGL's policy limits]" or "[f]or an 'occurrence' covered by this policy which is either excluded or not covered by the [CGL policy]." Thus, coverage under the umbrella policy is necessarily informed by the coverage under the CGL policy—after all, they are part of the same agreement. Under Ohio law, this court should conclude that Motorists has standing to raise the issue of coverage under the CGL policy. *See Ohio Contract Carriers Assn.* at syllabus.

{¶ 99} In this case, under the proposition of law accepted for review, we are deciding whether there is coverage under the agreement, which contains the CGL and umbrella policies. This is an issue of law that this court reviews de novo. *See Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 652

N.E.2d 684 (1995). To ignore the CGL policy—especially when the issue of coverage under that policy was included in the proposition of law accepted by this court and the issue was briefed by the parties—results in a false or incomplete interpretation of the entire agreement. *See Siltstone Resources, L.L.C. v. Ohio Pub. Works Comm.*, ___Ohio St.3d___, 2022-Ohio-483, ___N.E.3d___, ¶ 15 ("because this court reviews legal issues de novo, we are not constrained to accept the appellate court's legal analysis of whether CDC and other interest holders violated the deed's use restriction"); *State v. Harrison*, ___Ohio St.3d___, 2021-Ohio-4465, ___N.E.3d___, ¶ 55 (Brunner, J., concurring in judgment only) ("it is our duty to rightly apply the law" and "[o]nce an issue is raised * * *, even if the lower court erred or failed to consider a relevant legal principle in analyzing the case, we must still follow where the law leads us").

{¶ 100} For those reasons, I believe that Motorists has standing to raise the issue of coverage under the CGL policy in this case. Thus, I would first address that issue before reviewing the issue under the umbrella policy.

### III. OUR REVIEW

{¶ 101} The interpretation of a contract is a matter of law and thus our review in this case is de novo. *Nationwide Mut. Fire Ins. Co.* at 108. Our review is guided by our goal of giving effect to the contracting parties' intentions. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11, citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Cos.*, 86 Ohio St.3d 270, 273, 714 N.E.2d 898 (1999). Considering the scope of our review, our primary goal when interpreting contracts, the policy language in the insuring agreement, and the proposition of law that we accepted for review, I would look for coverage in this dispute under the CGL policy first.

## IV. COVERAGE UNDER THE CGL POLICY

{¶ 102} As stated above, whether there is coverage under the CGL policy depends on whether there was property damage caused by an occurrence. If there was, then the claim is covered, unless an exclusion or endorsement says otherwise.

### A. Property Damage

{¶ 103} According to the CGL policy, "property damage" means "[p]hysical injury to tangible property, including all resulting loss of use of that property." Under that definition, there was property damage in this case since the incorporation of the insured-supplier's component product structurally weakened the manufacturer's final product. *See Traveler's Ins. Co. v. Eljer Mfg., Inc.*, 197 Ill.2d 278, 301, 757 N.E.2d 481 (2001) ("tangible property suffers a 'physical' injury when the property is altered in appearance, shape, color or in other material dimension").

### B. The Occurrence

{¶ 104} Deciding whether there is an occurrence is a little more complicated, but not much. The CGL policy defines the term "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." In the past, this court has interpreted the word "accident," which the CGL policy leaves undefined, according to its plain and ordinary meaning as a fortuitous event that was both "unexpected, as well as unintended." *Westfield Ins. Co. v. Custom Agri Sys.*, 133 Ohio St.3d 476, 2012-Ohio-4712, 979 N.E.2d 269, ¶ 12-14.

{¶ 105} Pointing to *Custom Agri* and our more recent decision in *Ohio N. Univ. v. Charles Constr. Servs., Inc.*, 155 Ohio St.3d 197, 2018-Ohio-4057, 120 N.E.3d 762, Motorists argues that there was not an occurrence here, because what happened is essentially faulty workmanship, and faulty workmanship is not a fortuitous event. But there is a difference between a claim involving "a bad product" and one involving "bad workmanship," *Indalex, Inc. v. Natl. Union*, 83

A.3d 418, 424 (Pa.Super.2013), and this case involves a bad product, not bad workmanship. Because of that distinction, *Custom Agri* and *Ohio N.* are largely inapplicable.

{¶ 106} Instead, once those cases are distinguished, the proper inquiry here is simply, and more traditionally, whether the damage caused by the defective product was unforeseen and unintended from the standpoint of the insured. *See Lamar Homes*, *Inc. v. Mid-Contintent Cas. Co.*, 242 S.W.3d 1, 16 (Tex.2007). If it was, then there is an occurrence. If it was not, then there is no occurrence. Certainly, Ironics neither expected nor intended for its product to damage the glass bottles into which it was incorporated, and thus, there was an occurrence here. *See Indalex* at 426 ("defective products resulting in property loss, to property other than [the insureds'] products * * * [is] an 'occurrence' ").

### C. Exclusions

{¶ 107} Having found property damage and an occurrence, the only remaining question is whether any exclusions or endorsements preclude coverage in this case. The exclusions in the CGL policy that Motorists points to here mirror the exclusions in the umbrella policy discussed by the majority opinion. Those exclusions—the "your work," "your product," and "impaired property" exclusions—are all similarly inapplicable under the CGL policy. Ironics did not perform any work, its claim is not for damage to its product, and its claim does not involve impaired property that could be restored by removing and replacing its product.

{¶ 108} It is worth noting that while those three exclusions clearly do not apply, Motorists could have easily precluded coverage in this case by adding a standard endorsement to the policy that bars claims for " ' "property damage" included within the "products-completed operations hazard." ' " 3 *New Appleman Law of Liability Insurance*, Section 16.02, quoting standardized form CG 21 04 promulgated by the Insurance Services Office, Inc. Taking into consideration the

applicable definitions in the CGL policy, an endorsement like that would have precluded coverage for property damage arising out of any goods or products manufactured, sold, handled, distributed, or disposed of by Ironics. *See, e.g.*, *Eon Labs Mfg., Inc. v. Reliance Ins. Co.*, 756 A.2d 889 (Del.2000).

{¶ 109} The reason it is worth noting the absence of this endorsement is that we have previously refused to give insureds the benefits of bargains they did not make. *See, e.g.*, *AKC Inc. v. United Specialty Ins. Co.*, ___ Ohio St.3d ___, 2021-Ohio-3540, ___ N.E.3d ____, ¶ 16. But that rule works both ways. Just as we cannot rewrite an insurance policy to give an insured coverage that was never purchased, we cannot rewrite an insurance policy to bar claims that the insurer failed to exclude.

{¶ 110} Accordingly, in the absence of an exclusion or endorsement stating otherwise, there is coverage under the CGL policy when a defective product is incorporated into and damages a third party's product or property, and that result was unexpected and unintended from the standpoint of the insured.

### D. The Economic-Loss Rule and the Lower Court's Erroneous Decision

{¶ 111} In its decision below, the Sixth District Court of Appeals concluded that there was no coverage under the CGL policy because "the economic-loss rule applies in this case" and bars coverage for the manufacturer's "negligence and product liability claims." 2020-Ohio-137, 151 N.E.3d 1001, ¶ 28. That rule, however, has no application in this context.

{¶ 112} As the majority opinion thoroughly explains in its analysis of the umbrella policy, the economic-loss doctrine "is based on differences between tort law and contract law," majority opinion at ¶ 27, and is useful only to the extent that it helps determine whether liability sounds in tort or in contract, *id.* at ¶ 28.

{¶ 113} The economic-loss doctrine thus might be useful as "a liability defense or remedies doctrine," *Lamar*, 242 S.W.3d at 13, but it "is not a useful tool for determining insurance coverage," *id.* at 12. Instead, when, as here, "[t]he

insuring agreement does not mention torts, contracts, or economic losses," *id.* at 13, coverage decisions must turn on the policy's actual language, *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 268 Wis.2d 16, 2004 WI 2, 673 N.W.2d 65, ¶ 35.

{¶ 114} With the economic-loss doctrine removed from our coverage analysis, we can do as the policy instructs and focus on whether there was property damage caused by an occurrence. *See Lamar* at 13. Because there was an occurrence and resulting property damage, the Sixth District's decision in this case was incorrect. The economic-loss doctrine does not change that. Consequently, I would reverse the court of appeals' judgment at least in part and find coverage under the CGL policy.

## V. COVERAGE UNDER THE UMBRELLA POLICY

{¶ 115} Turning to the umbrella policy, I agree with the majority opinion that there is also coverage in this case under the umbrella policy. In my opinion, however, that coverage is only applicable once the coverage under the CGL policy has been exhausted.

## VI. CONCLUSION

{¶ 116} Because my view of this case is somewhat different from the view of the majority opinion, and because that view leads me to a slightly different result, I respectfully concur in judgment only in part and dissent in part.

_____

Milligan Pusateri Co., L.P.A., Merle D. Evans III, and Jack B. Cooper, for appellant.

Buckley King, L.P.A., and Theodore M. Dunn Jr., for appellee Ironics, Inc.

Shumaker, Loop & Kendrick, L.L.P., John Siciliano, and John K. Nelson, for appellee Owens-Brockway Glass Container, Inc.

Vorys, Sater, Seymour & Pease, L.L.P., and Natalia Steele, urging reversal for amicus curiae the Ohio Insurance Institute.

Brouse McDowell, L.P.A., Stacy R.C. Berliner, and P. Wesley Lambert, urging affirmance for amicus curiae United Policyholders.

_____